# WILLIAMS *v.* PAINE.

CLOUD UPON TITLE, BILL TO REMOVE; MARRIED WOMEN; POWERS OF ATTORNEY, REVOCATION OF BY WAR; EQUITY; ESTOPPEL.

1. Whether a bill in equity to remove cloud from title, for partition and an accounting for rents and profits, is maintainable by parties out of possession, considered but not decided.

2. A power of attorney to sell and convey the land of a married woman in this District, executed in 1859 by the married woman and her husband and properly acknowledged by them, was valid and sufficient both by statute and at common law to enable the attorney to sell and convey the land therein described; construing Maryland acts of 1715, ch. 47, 1766, ch. 14, and 1794, ch. 57, and acts of Congress of May 31, 1832 (4 Stat. 520), April 20, 1838 (5 Stat. 226), and March 3, 1865 (13 Stat. 531).

3. Where such a power of attorney so executed could have been properly executed by the attorney without any communication or intercourse with the principals, the civil war did not operate to revoke the power, although the principals resided in one of the insurrectionary States.

4. A deed of land executed by an attorney in supposed compliance with a previous power of attorney given by the owners of the land, is not a valid deed of bargain and sale where it recites that the attorney and not his principals thereby bargains and sells, and is signed, sealed and acknowledged as the deed of the attorney and not of the principals.

5. And the act of Congress of March 3, 1865 (13 Stat. 531), to cure defects in conveyances and to quiet titles in this District, does not validate such a deed. That act was not intended to apply to executory instruments or contracts, but only to instruments conveying or attempting to convey legal titles.

6. Where an incomplete and defective instrument intended as a deed of land, is insufficient in law to pass the legal title, but the intending vendors receive the purchase money and the intending vendees take possession under it, it will be treated in equity as passing an equitable estate to such vendees, which will not be divested by a court of equity at the instance of the vendors, except for fraud. Such vendors will in equity be estopped to deny the sale.

7. Where one of two innocent purchasers must suffer a loss, and especially in cases where one has misled the other, he who is the cause or occasion of that confidence by which the loss has been caused, will be held to bear it.

8. Neither infancy or coverture will constitute any excuse for a party guilty of concealment or misrepresentation.

No. 421.   Submitted May 9, 1895.   Decided October 1, 1895.

HEARING on an appeal by the complainants from a decree dismissing a bill for partition, accounting, etc.   *Affirmed.*

The COURT in its opinion stated the case as follows:

The bill in this case was filed on the 10th of February, 1893, by the appellants, Fannie P. Williams, Mary H. Bell, Robert Ransom, Jr., James J. B. Ransom, Matt. W. Mc-Corkle, Henry H. Ransom, George G. Ransom and Seymour H. Ransom, against the appellees, John W. Paine, Estelle T. Paine, John Paine and Ogle Tayloe Paine.   The bill, as amended, is framed with several aspects, and seeks to obtain relief in respect to several matters, and in various forms.   The plaintiffs allege themselves to be entitled in fee, as heirs at law of Mrs. Mary Ransom, deceased, to one undivided sixth part of square No. 53, located in the city of

Washington, District of Columbia, as tenants in common with the defendants, who own the other five-sixths of said square. Mrs. Ransom, under whom the plaintiffs claim, was the wife of General Robert Ransom, and died intestate, in North Carolina, February 7, 1881, her husband surviving her, but who has since died, and before the filing the bill in this case.

It appears from the allegations of the bill and the proof, that Mary Huntt, one of the three children left by Dr. Henry Huntt, who had died intestate, intermarried with Robert Ransom, Jr. ; and that the three children, namely, Mary Huntt, afterwards Mary Ransom, Fannie Huntt, who intermarried with George Gibson, and George Gibson Huntt, inherited as heirs at law of their father, Dr. Henry Huntt, the one moiety or half of said square No. 53, and of certain other parcels of ground in the city of Washington—the same having been previously acquired and held in equal moieties or halves, as tenants in common, by the said Dr. Henry Huntt and the late Benjamin Ogle Tayloe ; that, being so seized and possessed, after their marriage, Mary Ransom and her husband, Robert Ransom, then an officer in the army of the United States, and stationed at Carlisle, in the State of Pennsylvania, by their joint power of attorney, executed and acknowledged on the 23d of May, 1859, to George Gibson Huntt, the co-owner and brother of Mrs. Ransom, authorized and empowered the said George Gibson Huntt to control, manage, bargain and sell, and in that event to convey, etc., all their right, title and interest in said property. George Gibson Huntt was also an officer in the army. About two years from the date of the power of attorney, the civil war broke out between the States, and Robert Ransom resigned his commission in the army of the United States, and accepted a commission in the Confederate States army, and afterwards attained the high rank of Major General in that army ; and during the war his wife, the mother of the plaintiffs, remained in the South, within the Confederate lines. In the summer of 1864, and during the continuance of the war,

Walter S. Cox, Esq., then a practicing attorney here in the
city of Washington, a relative of the heirs of Dr. Huntt,
and now one of the Associate Justices of the Supreme
Court of the District of Columbia, was solicited, especially
by Mrs. Gibson, to effect a sale of the interest of the Huntt
heirs in the property mentioned and referred to in the power
of attorney, including square No. 53, held as tenants in
common, as before stated.    Accordingly, Mr. Cox, through
a real estate broker, did effect a sale of all the interest of
all the parties claiming as heirs of Dr. Huntt, in the prop-
erty so held as tenants in common, and which sale was
made to Benjamin Ogle Tayloe, the co-tenant, at and for
the sum of $2,500.    Thereupon Mr. Cox rendered a state-
ment to Mrs. Gibson, one of the parties in interest and a
sister of Mrs. Ransom, as follows :

Amount of purchase.................. . .....$2,500 00
Payment of taxes by Mr. Tayloe, amounting to.    199 27
_____

Leaving a balance of..................$2,300 73
to be divided into three parts, making the dividend to each .  ·
of the three heirs the sum of $766.91.    The whole amount
of the purchase money, less the taxes deducted, was paid
by Mr. Tayloe to Mr. Cox, and the latter paid over the
same to Mrs. Gibson ; and the share of Mrs. Ransom was
paid over to her, Mrs. Ransom, by her sister, Mrs. Gibson.
And on the 29th of November, 1864, George Gibson
Huntt, by virtue of the power of attorney from Ransom
and wife, before referred to, reciting the sale and payment
of the purchase money, made and executed the deed to
Tayloe, set forth in the record.    Both the power of attor-
ney and this deed to Tayloe were admitted to record to-
gether on the 14th of January, 1865.

It also appears, both from allegations and proof, that
Benjamin Ogle Tayloe died testate in 1868, leaving several
children, among them a daughter, Julia Dickinson Tayloe,
who had previously married John W. Paine, one of the de-
fendants ; and that the testator by his will, and codicil

thereto, devised his real estate, including square No. 53, to his three daughters in fee simple, as tenants in common; that afterwards, by deeds of partition, dated November 7, 1870, the real estate so devised in common was divided, and the devisees took their respective shares in severalty, and in this partition square No. 53 was allotted and conveyed to Mrs. Paine.   Mrs. Paine died intestate in February, 1872, leaving surviving her her husband, John W. Paine, and as her only heirs at law three infant children, defendants in this case.   The property was vacant and wholly unimproved; and some time before the purchase of the interest of the Huntt heirs, as above stated, their interest in the property had been sold for taxes due the corporation of the city of Washington, and Tayloe had become the purchaser and taken a deed therefor; and from that time forward he continued to pay all taxes and public dues thereon; and from the time of the partition of the real estate among the three daughters of the testator, John W. Paine, one of the defendants, continued to pay the taxes thereon, and to exercise exclusive ownership over the same, in right of his wife, and for himself and his children; and subsequently, at a cost of about $125,000, he erected twenty-two stone and brick dwelling houses on the square, from which he has been in the receipt of the rents.

The bill, alleging the facts to which we have referred, and others less material, prays for the following relief:

1st. That the deed or instrument purporting to be made by George Gibson Huntt, by virtue of the power of attorney made to him by Ransom and wife, be declared null and void, as a cloud upon the title of the plaintiffs;

2d. That the right of the plaintiffs to a one-sixth part or interest in fee as tenants in common in said square No. 53 be established against all the said defendants by decree, as well the tenant for life, as the reversioners, heirs at law of Mrs. Paine, deceased;

3d. That plaintiffs may have the said one-sixth part of square No. 53 set off to them in one undivided interest, if that

be found practicable, and if not, that a sale of said square may be had under the direction of the court, and a distribution of the proceeds according to the interests of the parties entitled;

4th. That John W. Paine, the surviving husband of Mrs. Paine, and one of the defendants, be required, under the direction of the court, to account to the plaintiffs for the rents and profits received by him from the said one-sixth part of said square No. 53, and that accounts thereof be taken; and,

5th. That the plaintiffs may have all such further and other relief as the nature of the case may require.

All grounds of relief as set forth in the bill are controverted by the answer of John W. Paine, the tenant for life; and the other defendants, by their answer, say that they are not in possession of said square, and have never been in possession of it; and that the property in controversy descended to them upon the death of their mother, subject to an estate for life by the curtesy vested in their father; and that they have no manner of interest or concern with the account of rents and profits prayed against the life tenant, and they therefore object to the bill as being multifarious. With respect to most of the facts alleged, they say they have no personal knowledge, and they therefore demand proof thereof.

The court below dismissed the bill, and the plaintiffs have appealed.

*Mr. Franklin H. Mackey* and *Mr. H. O. Claughton* for the appellants:

1. The jurisdiction of a court of equity to entertain this case is plain for a number of reasons:

1st. To avoid multiplicity of suits. The bill and the testimony show that there are twenty-two houses occupied by twenty-two different tenants holding under twenty-two separate and distinct leases. The defendants themselves

are non-residents. Even, therefore, if the court had jurisdiction for no other purpose, it would maintain it to avoid the twenty-two ejectment suits that would otherwise be necessary to assert the title of the plaintiffs.

2d. A judgment in ejectment would be binding only on the life tenant; after his death, the entire litigation could be reopened by the reversioners, so that the remedy at law is neither adequate nor complete.

3d. The *only* method of obtaining an adjudication of the plaintiff's title binding upon the reversioners is in equity, by a bill in partition, and that such a bill can be maintained the authorities all agree. White & Tudor Lead. Cas.; *Agar* v. *Fairfax*, vol. 2, pt. 1, p. 501, citing *Wills* v. *Slade*, 6 Vesey, 498, and *Gaskel* .v. *Gaskel*, 6 Sim. 643 ; Pom. Eq., vol. 3, 1387, citing *Lord Book* v. *Hertford*, 2 P. Wm. 518 ; *Gaskel* v. *Gaskel*, 6 Sim. 643 ; *Hobson* v. *Sherwood*, 4 Bear. 184 ; *Wills* v. *Slade*, 6 Ves. Jr. 498 ; *Evans* v. *Bagshaw*, L. R. 8 Eq. 469 ; *Agar* v. *Fairfax*, 2 Lead. Cas. in Eq. 880, 894 ; *Striker* v. *Mott*, 2 Paige, 387 ; *Shaker* v. *Mott*, 2 Paige, 387 ; Chan. Walworth, 1831 ; *Woodworth* v. *Campbell*, 5 Paige, 518 ; 1 Story Eq. Jur., secs. 656, 656*a*.

Undoubtedly the general doctrine is that when the plaintiff is out of possession and his title is *disputed* by the defendant in possession, a bill in partition will not lie until the *legal* title has been determined by a court of law, and for that purpose the court will retain the bill until the case has been tried at law. But there are a number of exceptions to the rule ; thus the bill may be maintained : 1st. If the plaintiff claims an equitable title. 2d. If the defendant claims an equitable title. 3d. If the remedy at law is not adequate or complete. 4th. Where there are other equitable matters alleged in the bill as a ground of relief, in which case, as the chancellor must determine the title in order to afford relief upon these other grounds, he will not stop with the partial relief, but will go on and grant the partition prayed for. 5th. If the title set up by the plain-

tiff is not doubtful, a mere hostile claim on the part of a tenant in common will not oust the jurisdiction. See in support of these propositions: *Campbell* v. *Lowe*, 9 Md. 500; *Foust* v. *Moorman*, 2 Ind. 17; White and Tud. Lead. Cases in Eq., vol. 2, pt. 1, p. 903; *Holloway* v. *Holloway*, 97 Mo. 643; *Gore* v. *Dickenson*, 98 Ala. 363; *Math* v. *DeBardelaben*, 75 Ala. 71; *Hawley* v. *Soper*, 13 Vt. 322; 14 Metc. 464; 2 Har. and McH. 260; *Overton* v. *Woolfolk*, 6 Dana (Ky). 371; *Lucas* v. *King*, 10 N. J. Eq. 277; *Tabler* v. *Meriman*, 2 Ohio St. 211; Freeman Co-Ten. & Part., sec. 450; *Godfrey* v. *Godfrey*, 17 Ind. 6; *Moore* v. *Shannon*, 6 Mackey, 157.

2. A married woman cannot convey real estate in this District by power of attorney. It needs no argument to establish this proposition. Such was the rule at common law, and that law, at least in this respect, remains in force here. *Halliday* v. *Daily*, 19 Wall. 606; *Sumner* v. *Conant*, 10 Vt. 1; *Mott* v. *Smith*, 16 Cal. 533; *Bank* v. *Rice*, 4 How. 225; *Rhea* v. *Rhenner*, 12 Pet. 345.

3. The act of March 3, 1865, gave no vitality to powers of attorney executed by married women prior to that date. The sole effect of the act was to cure certain enumerated *defective* executions and acknowledgments of deeds by parties having the power to make such deeds and acknowledgments, but who had defectively exercised such power. It did not create any new powers.

4. The power of attorney was revoked by the war. Concede the power of attorney to have been valid, the power was revoked as soon as the grantors of the power became incapacitated to do the act in person. In 1864, because of the existence of war, Mr. and Mrs. Ransom, residents of the Southern Confederacy, could not have bargained and sold and conveyed this property to Benjamin O. Tayloe, a citizen of the United States, residing in the District of Columbia. The agent could not do that which the principals themselves could not do. Story on Agency, secs. 481–484; *Insurance Co.* v. *Davis*, 95 U. S.

429 ; *United States* v. *Lapene*, 17 Wall. 601 ; *United States* v. *Lapene*, 9 Ct. Cl. 31 ; *Hagner* v. *Abbott*, 6 Wall. 532 ; *United States* v. *Grossmeyer*, 9 Wall. 72 ; *Wash. Univerity* v. *Finck*, 18 Wall. 106 ; *Griswold* v. *Waddington*, 16 Johns. R. 438 ; *Hanger* v. *Abbott*, 6 Wall. 532 ; *Conley* v. *Burson*, 1 Heiskell (Tenn.) 145 ; *Howell* v. *Gordon*, 10 Ga. 302 ; *Stoddart's Case*, 4 Ct. Claims, 511.

In *Insurance Co.* v. *Davis*, 95 U. S. 429, the court, while declaring it as a fundamental proposition that agencies of every sort are revoked by war, recognizes *one* exception to this rule, viz., that of allowing the payment of debts to an agent of an alien enemy when such agent resides in the same State with the debtor. A great number of such cases are to be found in the books, and all of these recognize the general doctrine while enforcing the exception. *Wood* v. *Smith*, 7 Wall. 453 ; *Sands* v. *Ins. Co.*, 50 N. Y. 626 ; *Ins. Co.* v. *Warwick*, 20 Gratt. 614 ; *Buchanan* v. *Corey*, 19 Johns. R. 137 ; *Conn.* v. *Penn.*, 1 Peters, C. Ct. 496 ; *Denniston* v. *Imbrie*, 3 Wash. C. C. 396. By the act of July 17, 1862 (12 Stat. at L. 591, sec. 6), and the proclamation of the President, issued in pursuance of it, July 25, 1862 (*id.* 1266), "all sales, transfers, or conveyances of the estate and property" of persons in rebellion after September 23, 1862, were made null and void. In *United States* v. *Lapene*, 17 Wall. 601, it was held under the non-intercourse act that an agency created while it was legal to create an agency *was revoked* as soon as the parties became residents of hostile portions of the country.

5. The instrument executed by George Gibson Huntt was not a conveyance but a contract of sale, and passed no title. Even if the power of attorney itself were valid, yet that could not avail the defendant, for Huntt never exercised the power vested in him. The paper itself is plainly but a contract of sale. It is so recognized in the acknowledgment by the endorsement on the paper itself and by the intention of the parties. It is well settled that whether a paper containing the words "bargain and sell" is to be

treated as a contract of sale or a deed of conveyance depends upon the intention of the parties.    Warvelle on Vendors, vol. 1, sec. 24.    The authorities abundantly support the text.    *Jackson* v. *Moncrief*, 5 Wend. 26; *Grey* v. *Packer*, 4 Watts & Bergh (Pa.) 18; *Ogden* v. *Brown*, 33 Pa. 249.    Where the question is doubtful the court will even go outside of the instrument and examine the circumstances attending the execution to determine the *intent*. *Phillips* v. *Swank*, 120 Pa. 76.

That the instrument executed by Huntt was a mere contract of sale can admit of no doubt when read in the light of these authorities.    While it contains the words " have bargained and sold," the subsequent language plainly indicates that they were not to have the effect of a deed of conveyance, for he says, " and I hereby further agree, in behalf of said Robert and Mary Ransom, that they shall and will, as soon as convenient, make and execute a proper deed of conveyance of said premises to Benj. Ogle Tayloe."    In *Foster* v. *Foster*, 1 Levinz, 55, one of the principal reasons given by the court for deciding an instrument *executory* was that it was called by the parties " articles of agreement."    In the paper now before us it is *acknowledged* not as a deed but as a " contract of sale," and the endorsement on the paper is, " George Gibson Huntt to Benj. Ogle Tayloe— contract of sale:"    Moreover, the correspondence offered in evidence by the defendant himself shows it was only intended as such.

6. Being a contract of sale and not a " deed for the conveyance of land," its defects were not cured by the statute. The object of the statute was to cure certain defects in deeds of record which had been intended by the parties to *pass the title*, and which by reason of some technical defect in the execution of the instrument failed of that purpose.    But this paper never was intended to pass the title.

7. Neither the defendants nor those under whom they claim were in actual possession of the *locus in quo* on the 3d of March, 1865, when the curative act was passed.    That

that statute was only for the benefit of those persons who·
were *then* in possession is evident from the fact that the stat-
ute is admittedly not prospective, but entirely *retroactive.* It
was not intended to benefit those who might *thereafter* pur-
chase, at a depreciated price, defective titles to unoccupied
property, and thereafter, by merely taking actual possession,
claim the benefit of the statute and a largely increased price
as a result.    In *Hevner* v. *Matthews,* 4 App. D. C. 380, this
court has said in this connection : " Seizin is presumed to
accompany title, and parties are presumed to be in posses-
sion under their deeds until the contrary is shown." This
is a well-settled principle, but in whom is the *title ?* Is it
in the party claiming under the defective deed or in the party
claiming under the perfect deed ?    The authorities have set-
tled it that where two persons are claiming unoccupied prop-
erty, the one under a perfect title and the other under a
defective title, the constructive possession is in him who has
the perfect title.    *Clarke* v. *Courtney,* 5 Pet. 354 ; *Barr* v.
*Gratz,* 4 Wheat. 213 ; *Armstrong* v. *Restau's Lessee,* 5 Md.
280 ; *Hoye* v. *Swan's Lessee, id.* 237 ; *Steedman* v. *Hilliard,*
3 Rich. (So. Ca.) 101.    These authorities show that thêre
can be no constructive possession when there is actual pos-
session ; the latter renders the former at once nugatory. A
man claiming under a defective deed can *never* have a con-
structive possession, but he may have an actual possession,
and the moment he takes that actual possession the con-
structive possession, which up to that time had been in the
party claiming under the perfect deed, is gone.    Where a
statute, therefore, declares that a defective deed shall be
deemed perfect if the party is in possession, it must neces-
sarily mean an actual possession.

8.  Receipt of the purchase money does not estop a mar-
ried woman.    There is no such evidence in this record as
would enable the court to say that Mrs. Ransom received
the purchase money in this case with full knowledge of the
facts.    Knowledge is always requisite to an estoppel even
in case of persons *sui juris,* and *a fortiori* it would be so in

the case of a married woman.   But the doctrine which pre-
vails with the best authorities is that even with knowledge
a married woman is not estopped.   *Clidden* v. *Strupler*, 52
Pa. 400 ;  *Cury* v. *Foster*, 2 Wall. 34 ;  *Coal Co.* v. *Pasco*, 79
Ill. 164 ;  *Bank* v. *Rice*, 4 How. 225 ;  *Patterson* v. *Lawrence*,
90 Ill.  174 ;  *Drake* v. *Glover*, 30 Ala.  382 ;  *Connolly* v.
*Braustler*, 3  Bush, 702 ; Bigelow Estoppel, 513 (3d ed.) ;
*Carpenter* v. *Carpenter*, 10 C. E. Green, 194.

9. The equities are with the plaintiffs.   In 1864, when
this property was sold, a war was raging  between two sec-
tions of the country.   It was not known when it would end.
The price of  real estate in Washing City never was  lower,
while the sale of it at that time could be of no possible
benefit to Mrs. Ransom.   She could not then receive the
purchase money, and it was not, as the testimony shows,
intended that she should receive it " until the war was over."
Undoubtedly, if only her interests, instead of the interests of
the other heirs, who desired and probably needed the money,
had been consulted, the sale would not have been made.
However unintentional it may have been, her interests were
sacrificed to raise money for others.   When the power of
attorney was executed, nearly two years before the war, it
was, as Mrs. Gibson testifies, the purpose to sell *at once.*   It
was presumably never in contemplation of Mr. and Mrs.
Ransom that five or six years afterwards, under circum-
stances never dreamed of by any of the parties, a sale should
be made of their interests, when they could not—possibly
for years afterwards, and possibly never—derive any benefit
from such sale.   If the war had not revoked this power of
attorney, certainly, from an equitable standpoint, the un-
contemplated change in the relation and situation of the
parties should have revoked it, just as marriage and birth of
issue revokes a will, and death an agency.

*Mr. Calderon Carlisle* and *Mr. Wm. G. Johnson* for the
appellees :

1. The power of attorney and execution thereof by Huntt are valid and passed the legal estate of complainant's mother. " Where a married woman is capable of doing an act, or of transferring property or rights with the assent of her husband, there, perhaps she may, with the assent of her husband, appoint an agent or attorney to do the same thing.". Story on Agency, § 6.

Powers of attorney by *baron* and *feme* to convey the lands of the wife were not unknown or unused in the early days of the colonies. In McNayr's Conveyancing, published in Glasgow, 1789, is given a form of a letter of attorney " from husband and wife to sell a plantation, sugarwork and negroes, and to execute the deed of conveyance," (p. 138), while in the provincial court of the Province of Maryland such a power of attorney appears not only to have been recognized by the court, but judgment given in favor of the validity of the deed made thereunder as far back as 1738. *Elliott's Lessee* v. *Osborn*, 1 Harr. & McH. 146. To deny validity to such instruments now, in a court of equity, upon no equitable ground, would unsettle many ancient titles derived through such instruments.

2. The act of March 3, 1865, cured any defect in the power of attorney. Congress, by that act, undertook to quiet and set at rest many questions as to the validity of titles, and has forever put an end to such contentions as are made by the complainants in this case. The defendants having acquired title through the deed of partition executed in November, 1870, and recorded in December, 1870, claim under the original act (13 Statutes at Large, p. 531), and are not bound by any modification introduced by the revision of 1874, their rights being determined by the law as it stood at the time they acquired title. *Osborn* v. *Nicholson*, 13 Wall. 662.

3. By the modern law of nations the only principle governing the conduct and relations of individuals which has clearly survived all the strict rights of war is that of non-. intercourse. Trading or communicating with the enemy is

alike forbidden by the municipal law of each belligerent, and by the sanction of the public law of nations. The prohibition may be applied without any declaration of the sovereign, or the principle of the law of nations may be invoked and expressly declared in a municipal statute. But where, in time of war, an executory contract made before the war between residents of the belligerent States may be completely executed without such intercourse—where an obligation contracted before the war between those who have become enemies, can be honestly discharged without such intercourse—where an obligation is by circumstances imposed upon a resident in the territory of one belligerent towards a resident in the territory of the other—or such an obligation is voluntarily assumed—and no intercourse is necessary to complete it, in all three of these cases, by the principles of modern public law, and by the policy of municipal laws in modern times, such acts are lawful and valid, the contract would be well executed in the first case ; the obligation would be validly and justly discharged in the second ; and validly and justly assumed in the third. No decision of binding authority on this court holds a power of attorney such as the one in this case to be revoked by the war. And no case can be found where such a power acted on by both parties has been held illegal or void.

It is quite obvious, therefore, that the fact of war does not revoke an agency as matter of law, but that whether it operates as a revocation or not, depends upon all the circumstances. In this case, while communication was not permitted during the war, it appears that it was going on constantly, yet no attempt to revoke was ever made, and certainly the act of the agent was ratified and confirmed in the most unequivocal manner immediately after the war by the acceptance of the purchase money. Much slighter evidence than is contained in this record has been held by the Supreme Court to establish a ratification. *Lyon* v. *Pollock*, 99 U. S. 673.

4. The instrument executed by Huntt is within the relief

of the statute.   It is in terms a bargain and sale, and the
further covenant that the principals make a further assur-
ance does not defeat its character.   *Willis* v. *Boucher*, 3
Wash. C. C. 376.   It is to be remembered that the whole
purpose of the statute is to reach informal and defective in-
struments, and that it is a statute which is to be liberally
construed in favor of effectuating the intent of the parties,
and not to be strictly construed so as to defeat that intent.
It must be construed in harmony with and not against its
purpose.

   5.  Possession at the time of the passage of the act was not
essential.   The language of the act is " in *favor* of parties
in actual possession claiming under and through such
deeds."   This manifestly applies to possession at the time
the deed is relied upon as a defence.   It was the purpose of
the acts to " *quiet* " titles, and, therefore, it provided that
persons in possession, claiming under such deeds might
*defend* by them, but did not intend to *disquiet* titles by per-
mitting persons out of possession to *recover* by them.   The
restricted construction insisted upon by complainants would
deprive the grantees in possession of one who was in pos-
session at the time of the passage of the act of all benefit
of its provisions, which is too unreasonable to admit of
consideration.

   6.  It is further insisted that the decree should be reversed
because the receipt of purchase money does not estop a
married woman, and under this head a number of authori-
ties are cited holding that the legal estate of a married
woman cannot pass by estoppel against the provisions of
the statutes regulating conveyancing by her.

   It is not necessary to invoke the doctrine of conveyance
by estoppel in this case.   The complainants, standing in the
place of their mother, have come into equity asking relief.
In such a situation a married woman and those claiming
through her are as much bound by the principles and prac-
tice of equity as other persons.   They must alike show
that they have an equity for relief, and they also must do

equity if they seek equity. The claim here is founded wholly upon a supposed legal infirmity in a conveyance, and the maker of that instrument asks relief from it upon no equitable grounds whatever. It is in just such cases that the Supreme Court has denied relief. *Chilton* v. *Braiden's Adm'x*, 2 Black, 460; *Bank* v. *Partee*, 99 U. S. 329; *Bein* v. *Heath*, 6 How. 247; see also *Bedford* v. *Burton*, 106 U. S. 338; *Gridley* v. *Wyant*, 23 How. 500; *Gridley* v. *Westbrooke*, 23 How. 503. Unless, therefore, a married woman shows an equity to relief she cannot obtain the aid of chancery, nor can she obtain its aid to do that which is against conscience.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

There is a preliminary objection taken to the right of the plaintiffs to maintain the bill, which is aside from the real merits of the case, and that is, that as the plaintiffs are out of possession of the property, and the principal relief prayed being for removal of cloud from the title and for partition of the property either in specie, or for sale for purposes of partition of the proceeds of sale, the plaintiffs are not in such relation to the property as to entitle them to apply for such relief. In other words, that the possession of the property being held adversely to the claim of the plaintiffs, a court of equity cannot grant relief in such case, but the remedy, if the parties be entitled to any, must be by action at law. It is clear, the bill is filed upon the assumption that the legal title to the property claimed is in the plaintiffs, and the bill therefore presents the case of parties out of possession, claiming the legal title to the property in question, and therefore seeking to oust the parties in possession, who also claim the legal title, and to compel an account for rents and profits. This objection, among others, was sustained by the court below upon the authority of *Hipp* v. *Babin*, 19 How. 271; *Killian* v. *Eb-*

*binghaus,* 110 U. S. 573 ; *Moore* v. *Shannon,* 6 Mackey, 157 ; Freeman on Co-Tenancy and Partition, sec. 446; 2 Lead. Cas. Eq. (*Agar* v. *Fairfax*), pp. 900–903 ; 3 Pom. Eq., secs. 1387, 1388. It is supposed and contended by the defendants that this is nothing more in substance and legal effect than an ejectment bill ; that the title, according to the allegations of the bill, is merely legal, and that there is no sufficient matter or circumstances stated to show the necessity for resorting to a court of equity. It is certainly the well established doctrine of a court of equity, that it will not entertain suits for establishing legal titles, and that such doctrine is founded upon the clearest reason ; " and the departing from that practice, where there is no necessity for so doing, would be subversive of the legal and consti- tutional distinctions between the different jurisdictions of law and equity." *Hipp* v. *Babin, supra.* And it is equally well settled that " where a party has á right to a posses- sion, which he can enforce at law, his right to the rents and profits is also a legal right, and must be enforced in the same jurisdiction. The instances where bills for an account of rents and profits have been maintained are those in which special grounds have been stated, to show that courts of law could not give a plain, adequate, and complete remedy." Id. Indeed, the case of *Hipp* v. *Babin* presents several features of close analogy to those presented in this case. And with respect to the matter alleged as constitut- ing a cloud upon the title, it is well settled, that only those having a clear legal title, *with the possession*, can ask a court of equity to remove a cloud on title. *Orton* v. *Smith,* 18 How. 263. The matter alleged to create a cloud upon the title is apparent of record, open to the view and inspec- tion of every one, and presents only a question of law as to the legal effect of the instruments. The plaintiffs claim a legal title, asserting that these instruments of record are utterly void and without effect, and their right to succeed depends upon such legal title, without regard to any equit- able right under the contract of sale, or any title or interest

that may be asserted by the defendants.   It is conceded, if
the plaintiffs have not a legal title to the property claimed
by them, they have no right at all.

But, without further considering, and without deeming it
necessary to decide, this preliminaiy or jurisdictional ques-
tion, we shall proceed to consider the questions arising
upon the merits of the case ; and these questions are :

1st. Whether the power of attorney of the 23d of May,
1859, made and executed by Robert Ransom and Mary H.
Ransom, his wife, to George Gibson Huntt, and which re-
mained unrevoked by any express act or declaration of the
principals, invested the nominated attorney with such legal
authority as to enable him to bargain and sell, and there-
upon to convey, or to contract to convey, by deed of
bargain and sale, the property therein mentioned and re-
ferred to ?

2d. If the power was valid and enabled the attorney to
bargain and sell the property at the time it was made,
whether the subsequent occurrence of the civil war, and the
principals going into the seceded States, and remaining
there during the war, and the husband becoming an active
participant in the war against the Union, had the effect to
revoke and render null the power of attorney, and thereby
to destroy all authority previously vested in George G.
Huntt to deal with the property of his principals?

3d. But, supposing the power of attorney to be valid,
and that it remained valid, notwithstanding the occurrence
of the war, was the deed of the 29th of November, 1864,
an effective execution of the power, or authorized thereby,
so as to vest in the purchaser of the property a title, either
legal or equitable ?

4th. If the deed made under the power was not valid as
a deed of conveyance by the then existing law, was it cured
and made valid by the act of Congress of March 3, 1865,
entitled " An act to quiet titles in favor of parties in actual
possession of land in the District of Columbia ?"

5th. If this act of 1865 does not apply, and the deed

made by the attorney of the 29th of November, 1864, does not operate as a conveyance of the legal title, is there such equity in the defence, and on the facts of the case, as will bar and preclude the relief sought by the plaintiffs ?

1. With respect to the first of these questions, it is doubtless the case, that in most, if not all the States, there are statutes authorizing the wife by joining in deed with her husband, and by separate or privy acknowledgment of the wife, to convey real estate. But whether by statute or otherwise, it has been the custom in this country from its earliest history, for the wife to convey her real estate by the joint deed of herself and her husband. In most, if not all the States, there have been statutes prescribing certain conditions and formalities for the conveyance of the wife's real estate ; such as the separate acknowledgment from her husband ; such acknowledgment of the deed being regarded as one of the most essential acts to give validity to the deed. And where the prescribed forms have been complied with, the nature and extent of the estate conveyed, and the objects and purposes thereof, are unrestricted ; and the courts have been liberal in supporting the right to convey. Hence a married woman may mortgage as well as unconditionally alienate her real estate, by joining her husband in the conveyance and making the acknowledgment, and this, though no part of the consideration, may pass to her ; and thus she may subject her real estate to the risk of complete alienation by foreclosure for her husband's debts, or by sale under a power of sale therein conferred. It is settled that *she may thus create a valid power in the mortgage to sell* in default of payment ; and so she may convey upon condition ; and prescribe the terms of the condition ; and thus greatly depart from the old common law modes and forms of conveyance of *femes covert* by fines, and common recoveries. 2 Kent. Com. 150, 151, 167 ; *Swan* v. *Wiswall*, 15 Pick. 126 ; *Whiting* v. *Stevens*, 4 Conn. 44 ; *McCullough* v. *Wilson*, 21 Penn. St. 436 ; *Black* v. *Galway*, 24 Penn. St. 18 ; Schouler, Hus. and Wife, sec. 176.

At the common law, the conveyance of a *feme covert*, except by some matter of record, was absolutely void, and in England, until the St. 3 & 4 W. 4, ch. 74, abolishing fines and recoveries, a *feme covert* could only pass her freehold estate, not held as her separate estate, by fine or common recovery. In Maryland, however, whose laws in force in 1801 were adopted for this District, and are still in force here, except where changed or modified by acts of Congress, the substitution of the ordinary deed of conveyance by the wife for fine or common recovery, was made by the colonial statutes of 1715, ch. 47, 1752, ch. 8, and 1766, ch. 14; and the ceremony of private examination of the *feme covert*, and her voluntary acknowledgment of the deed, were made substitutes for the private examination as to her voluntary consent in the levying of the fine or recovery.

The act of 1715, ch. 47, after declaring what nature of conveyances should be made, executed and recorded, in order to pass any freehold, or an estate for a term of more than seven years, then provides, that when the grantors or bargainors may live remote from the court or officer required to take the acknowledgment, in the county where the land was situated, such acknowledgment was authorized to be taken where the grantor or bargainor lived ; and it is then further provided, that " *if any such grantor or bargainor* of any lands or tenements, &c., shall happen to be out of the province, &c., at the time of the ensealing such writing, so as the same cannot be acknowledged, as is before directed, or enrolled within the time for that purpose hereinbefore limited, that *in every such case* such lands or tenements as aforesaid shall be acknowledged by *a letter of attorney*, well and sufficiently proved, &c., anything hereinbefore contained to the contrary thereof notwithstanding." And, in a succeeding section of the same act, it is provided, " that if any *feme covert* be named as grantor in any such writing *indented* [the indenting is dispensed with by act of 1794, ch. 57], the same shall not be in force to debar her or her heirs, except upon her acknowledgment of the same, and the person tak-

ing such acknowledgment shall examine her privately out of the hearing of her husband, whether she doth make her acknowledgment of the same willingly and freely, and without being induced thereto by fear or threats of, or ill usage by her husband, or fear of his displeasure." This acknowledgment is required to be reduced to writing and certified by the judge or justice taking the same, and it is required to be recorded, and which acknowledgment so made shall bar the *feme covert* and her heirs. And so by the act of 1766, ch. 14, it is provided that *any person or persons* conveying land and not living within the province, so that the deed cannot be acknowledged as previously directed, then and in every such case the deed or conveyance shall be acknowledged by *letter of attorney*, well and sufficiently proved, &c. And in a succeeding section of this last mentioned act, it is provided that any *feme covert* joining with her husband in any of the several kinds of conveyances thereinbefore mentioned, and acknowledging them upon private examination, according to the form and direction of the previous act of 1715, where such *femes covert* have the right, title or interest of the lands, or any part thereof, intended to be conveyed, shall, by such execution, examination, acknowledgment and enrolment, be barred and foreclosed to all intents and purposes whatsoever. These provisions of the acts of 1715 and 1766 were in force in this District in 1859, and are still in force, and they were in no respect repealed by or in conflict with the acts of Congress of the 31st of May, 1832, (4 Stat. 520), and of the 20th of April, 1838, (5 Stat. 226), relating to the execution and acknowledgment of deeds for land in the District of Columbia. The acts of Congress do not profess to repeal the acts of Maryland of 1715 and 1766, or to be exclusive in their operation; but they have, in some particulars, not involved here, amplified and extended the provisions of the former statutes then in force. And construing these statutes altogether, and looking to the reason and policy upon which they are founded, it would seem to be clear that in the year 1859 and down to the

year 1865, it was competent to a *feme covert,* by a joint
power of attorney with her husband, duly executed and ac-
knowledged according to the forms prescribed by the stat-
ute, to execute and acknowledge a valid deed of conveyance
of her real estate situate in the District of Columbia.   It is
well settled that a power to convey land must possess the
same requisites, and observe the same solemnities in execu-
tion and acknowledgment, as are necessary in a deed
directly conveying the land; and that a title to land can
only be acquired and lost according to the laws of the place
where the land is situated.   *Clark* v. *Graham,* 6 Wheat.
577.   In this case, the property to be conveyed was spe-
cifically mentioned and described in the power of attorney ;
and the power of attorney was executed and acknowledged
at Carlisle, in the State of Pennsylvania, by husband and
wife, under their hands and seals, and the acknowledgment
and authentication of the instrument was in all respects in
accordance with the provisions of the statutes in force in
the District of Columbia, providing the manner and form
in which the real estate of *femes covert* could be conveyed.
Indeed, we do not understand that the statutory require-
ment in respect to the form of acknowledgment and authen-
tication thereof, is a matter of objection.   The terms of the
statutes, " any grantor or bargainor of any lands or tene-
ments," being out of the province ; or " any person or per-
sons conveying," &c., not residing in the province at the
time, &c., may acknowledge said deed by letter of attor-
ney, well and sufficiently proved, &c., are sufficient to em-
brace *femes covert,* authorized to sell and convey their real
estate.   If not, then the husband could not sell and con-
vey by power of attorney, free of the contingent right of
dower of his wife, for if the wife could not acknowledge by
power of attorney a deed for the conveyance of her own
real estate, she would be equally unable to acknowledge,
by power of attorney, a deed for the relinquishment of
dower in the lands of her husband.   Such disability, we
think, was never intended by the legislatures passing the

statutes to which we have referred, to be fixed upon *femes covert*, having lands with right to convey the same.

But even in the absence of any express statutory authority, for the execution and acknowledgment of a deed of a *feme covert* by power of attorney, seeing that *femes covert* have full and complete right to convey their real estate by the joinder of their husbands in the deed, the power to execute and acknowledge deeds of conveyance by power of attorney, jointly executed by husband and wife, with the private examination of and acknowledgment by the wife, as in the case of a deed of conveyance jointly executed by them, would seem to be reasonably implied, and it is difficult to perceive any good reason why it should not be allowed.   It certainly subserves the convenience of parties; and we may well suppose, from the frequency of the occurrence of such powers in reported cases, that many titles are dependent upon the existence, of the power of *femes covert* to make and acknowledge deeds of conveyance by attorney.

That such power exists in *femes covert*, with general right to convey their real estate, would seem to be the view entertained by writers of high authority.   In Story on Agency, sec. 6, the author says—" In regard to married women, ordinarily, they are incapable of appointing an agent or attorney ; and even in case of a joint suit at law, an appointment of an attorney by a married woman is void, and her husband may make an attorney for both.   But where a married woman is · capable of doing an act, or of transferring property or rights with the assent of her husband, there, perhaps, she may, with the assent of her husband, appoint an agent or attorney to do the same."   And so Professor Washburn, in his work on Real Property, vol. 3, pages 232, 233, says that it is laid down, unqualifiedly, in some of the States that a married woman cannot make a valid power of attorney, even jointly with her husband, to make a deed of her interest.   " But," says the author, " it is difficult to perceive any reason for the rule where she

can do the principal thing herself; and such a right is clearly recognized by statute in Massachusetts ; and a similar right is also recognized by statute in New York."

The câse of *Holladay* v. *Daily*, 19 Wall. 606, cited and relied on by the plaintiffs, would not seem to have much application to this case, though the principle of implied right in the wife, jointly with her husband, to constitute an attorney to convey her estate, is clearly recognized.   In that case, Holladay and his wife gave to one Hughes a power of· attorney to sell and convey certain real property, the title to which was stated in the power to be in Holladay. Hughes sold and conveyed the premises in the name of Holladay alone, and as his attorney.   The question presented was whether the deed thus executed in the individual name of Holladay, and not in the joint names of himself and wife, was sufficient to pass *his* title ; and the court held that it was.   In the course of the opinion, the court said—assuming that, without a statute of Colorado, authorizing the making of such power of attorney, " the authority of a married woman to convey, in connection with her husband, which is conferred, implies a power to appoint an attorney for that purpose—and there are adjudged cases which proceed upon that theory—we do not see any objection to the validity of the deed actually executed in the name of Holladay alone, or to its operation in passing the title."

But what is more immediately in point on this question, is the recognition of the right to make such power of attorney, by the act of Congress of March 3, 1865, passed for curing defects and quieting of titles in this District.  By that act, the pre-existing right of a married woman, owning land in this District, to appoint an attorney jointly with her husband to convey such land, is expressly recognized, and any defects therein, or in the execution thereof, cured. After enumerating various defects in conveyances intended to be cured by the act, such conveyances are declared valid, provided, " That when the power of attorney shall

have been executed by a *feme covert* the same shall be
effectual and sufficient, if there shall have been such an
acknowledgment of the same as would be sufficient, un-
der the provisions of this act, to pass her estate 'and inter-
est therein were she a party executing the deed of convey-
ance," &c.    In this case, as we have already seen, the wife
jointly with her husband executed the power of attorney,
and she was separately examined from her husband, and
made her acknowledgment in due form.

Upon the whole, we are clearly of opinion that the power
of attorney was valid and sufficient to enable the attorney
therein named to· sell and convey the real estate of the
*feme covert* therein described.

2. The next question is, as to the effect of the civil war
upon the power of attorney—whether the power of attorney
was thereby revoked, or its execution suspended during the
war?  This depends upon the nature of the duties to be
performed under and in execution of the power.   For it is
well settled that the occurrence of war between the States
or nations to which the respective parties belong does not
necessarily annul and destroy all prior contracts subsisting
between such parties.   It is true, all trade, and private bus-
iness intercourse, between the citizens or residents of the
one belligerent State or nation, with those of the other
belligerent State or nation, is illegal and therefore void.
But this principle is not so general and extensive as to in-
clude all contracts and engagements·entered into *before* the
war.   There are some prior contracts that, from their very
nature, the subsequent occurrence of war will avoid; but
those are contracts that necessarily require intercourse and
communication between the citizens of the belligerent States,
in order to the due performance of such contracts.   In
such cases, both upon principles that are universally ob-
served and enforced as between belligerents, and as matter of
necessity, the contracts are vacated by the occurrence of
war between the States to which the differerent parties belong,
because they cannot be performed, consistently with law.

But that is not the case here. In this case, as we have already stated, the property, situated here in the city of Washington, was owned and held by parties as tenants in common. It was unimproved, and the question when it could be advantageously sold was, as we may well assume, a matter of great uncertainty. The parties appointing the attorney contemplated an absence, and they made the power without any limitation as to the time of its duration, or the time within which it should be executed. The power recites and declares as follows :

" To provide for the contingency of our absence, we, the said Robert Ransom, Jr., and Mary, my wife, do by these presents constitute and appoint, and in our place put and depute the said George Gibson Huntt, of Washington City aforesaid, to be our true and lawful attorney in fact, for us and in our name, place and stead, to control, manage, grant, bargain and sell, and, in that event, convey all our right, title and interest in and to the said lots and square of ground, or any part or parts thereof, or to join in and for us and in our name to sign any proceedings in partition of the said lots and square, or to appear for us in court for that purpose. And in regard to the said real estate, to do, execute and perform, every act and thing necessary to be done as fully and amply as we might or could do, if personally present. And we do hereby ratify and confirm all and whatsoever our said attorney in fact may legally do in the premises."

Language more comprehensive and unrestrictive could hardly be employed. And the power could well be executed without any communication or intercourse whatever with the principals making the power. The execution of the power no more required intercourse or communication with the principals than did the exercise of the power of sale in the case of *University* v. *Finch*, 18 Wall. 106. In that case the question was as to the execution of the power by a person in whom a trust had been reposed, before the commencement of the war, in regard to real estate, and

where the land, the trustee or donee of the power, and the *cestui que trust*, were all within a State whose citizens were loyal and supporting the Union, while the grantors in the deed of trust, the donors of the power, were citizens and residents of one of the States declared to be in insurrection at the time of the sale, which was made while the war was flagrant; and it was held that the existence of war did not defeat the execution of the power. The right of an owner of real estate, situate within territory or part of a State over which the United States had unobstructed jurisdiction and control, to appoint an agent and invest him with authority to superintend and manage the estate, though the owner, during the time, resided in one of the insurrectionary States, was recognized in the case of *United States* v. *Lee*, 106 U. S. 196 ; and the principle was fully recognized and clearly stated by Mr. Justice WASHINGTON, in the cases of *Conn.* v. *Penn.*, Pet. C. C. 496, and *Dennison* v. *Imbrie*, 3 Wash. C. C. 396. In the case of *Buchanan* v. *Curry*, 19 John. 137, it was held by the Supreme Court of New York, that it was not unlawful for a citizen of that State to pay a debt, or perform a contract with an *alien enemy*, during the war, if the payment or performance was made to the agent of such alien enemy *within that State— the contract having been made before the war*. And if the money so received by the agent be transmitted by him to the principal, without the debtor's connivance, the latter will not be responsible for it. The three cases last mentioned were all referred to with approval by the Supreme Court of the United States, in the case of *Insurance Co.* v. *Davis*, 95 U. S. 425, 429, 432. In the case of *Ins. Co.* v. *Davis*, just mentioned, the subject is quite fully discussed, and in considering the effect of war upon a power of attorney made prior to the commencement of hostilities, the court say:

" Emerigon says, that if a foreigner is forced to depart from one country in consequence of a declaration of war with his own he may leave a power of attorney to a friend

to collect his debts, and even to sue for them.    Trait des Assurances, vol. 1, 567.    But though a power of attorney to collect debts, given under such circumstances, might be valid, it is generally conceded that a power of attorney cannot be given, during the existence of war, by a citizen of one of the belligerent countries resident therein, to a citizen or resident of the other ; for that would be holding intercourse with the enemy, which is forbidden.    Perhaps it may be assumed that an agent *ante bellum,* who continues to act as such during the war, in the receipt of money or property on behalf of his principal, where it is the manifest interest of the latter that he should do so, as in the collection of rents and other debts, the assent of the principal will be presumed, unless the contrary be shown ; but that, where it is against his interest, or would impose upon him some new obligation or burden, his assent will not be presumed, but must be proved, either by his subsequent ratification or in some other manner."

In this case there is nothing to show in the slightest manner that the principals in the power of attorney were damnified or prejudiced by the execution of the power, or that it was against their interest that the power should be executed by effecting a sale of their interest in the property. On the contrary, under the then existing circumstances, a sale was necessary as a means of realizing anything for their interest in the property.    The property was entirely unproductive, being unimproved.    It was liable for taxes, and taxes were in arrear ; indeed, the undivided interest of the Huntt heirs had been sold for taxes, and bought in by Mr. Tayloe.    It was, moreover, subject to confiscation by the Government to the extent of the life interest therein of General Ransom, the husband ; and it was the right of the other parties in interest to have partition of the property, and to have their respective interests reduced to severalty, if not to have a sale for purposes of partition.    *Willard* v. *Willard,* 145 U. S. 120.    And the fact that the principals in the power of attorney were absent and within the Confederate lines would

not have prevented effective proceedings for that purpose (*University* v. *Finch*, 18 Wall. 106); so that they were unable to retain their interest in the property in its original undivided condition. It was, therefore, rather to the interest of Ransom and wife than otherwise, that their interest in the property should be sold. In addition to this, there were approval and ratification of the sale by the receipt of the purchase money.

We can perceive no sufficient reason, therefore, for holding that the power was either revoked or suspended by the war, or that its execution by sale of the property was prejudicial to the interest of the principals giving the power.

3. We come now to the question, whether the deed or instrument of the 29th of November, 1864,* made by the attorney, George Gibson Huntt, to Benjamin Ogle Tayloe, was such deed of bargain and sale of the interest of Mrs. Ransom and her husband in the property, as to bar and preclude those parties from making further claim thereto. And this presents the question. What is the true nature of the instrument? Is it a conveyance operating as a grant of

---

*Deed.* Know all men by these presents, that I, George Gibson Huntt, by virtue of the annexed power of attorney to me from Robert Ransom, Jr., and Mary Ransom, his wife, and for and in consideration of the sum of eight hundred and thirty-three 33-100 dollars to me in hand paid by Benjamin Ogle Tayloe, of the city of Washington, in the District of Columbia, receipt of which is hereby acknowledged, have bargained and sold to said B. O. Tayloe, his heirs and assigns, all the right, title and estate of them, the said Robert Ransom, Jr., and Mary Ransom, being one undivided third part of, in, and to these pieces of ground in the city of Washington aforesaid, known and described, as lots Nos. one and three in square No. five, lot No. ten in square No. fourteen, lots Nos. five and nine in square No. seventeen, lots Nos. three and four in square No. twenty-eight, lot No. three in square No. thirty and the whole of square No. fifty-three, with the improvements and appurtenances; and I hereby further agree in behalf of said Robert and Mary Ransom, that they shall and will, as soon as convenient, make and execute a proper deed of conveyance of said premises to said Benj'n O. Tayloe, in fee simple.

In testimony whereof, I have hereunto set my hand and seal this 29th day of November, A. D. 1864. George Gibson Huntt. [Seal]. [Stamp, $1. G. G. H. Jan. 4th, '65]. Witness: W. Kline.

the legal estate *in præsenti*, or is it only a contract for a further conveyance, contemplating a more formal and effective deed for the conveyance of the legal title ? On the part of the defendants, it is contended that the instrument, though not in the ordinary form, is good and effectual as a deed of bargain and sale. While, on the other hand, it is contended by the plaintiffs, that the instrument is nothing more than a contract for a future conveyance to be executed by the principals in the power of attorney.

It is quite true, it requires no special formality to create a good deed of bargain and sale. If the deed be executed with the requisite solemnity, as prescribed by the statute, and contain words expressive of a present intention to convey and transfer the estate without further ceremony, it will, ordinarily, be sufficient. The conveyance by bargain and sale, as we know, had its origin in the ordinary contract of bargain and sale, enforcible by the court of chancery. The words bargain and sale, however, are not necessary to make it a bargain and sale, within the statute ; but any words at common law, that upon a valuable consideration *would have raised a use*, will be sufficient to create a bargain and sale within the Statute of Uses. · Gilbert on Uses, 493 ; Tud. Lead. Cas. 265 ; 2 Washb. R. Pro. 392.

The instrument here is executed as a deed, though not in the regular or usual form of a deed of bargain and sale. And while the power is referred to in the body of the instrument, the latter is signed, sealed and acknowledged as the deed or contract of the attorney, and not as that of the principals. The amount of the consideration is mentioned, and the fact of its full payment is recited ; and it is then declared by the attorney executing the deed, that *he* thereby bargained and sold to said Benj. O. Tayloe, his heirs and assigns, all the right, title and estate of his principals, naming them, in the property described, including square No. 53, the property in controversy. The instrument then concludes in these terms : "And I hereby further agree in behalf of said Robert and Mary Ransom, that they shall and will, as

soon as convenient, make and execute a proper deed of conveyance of said premises to said Benj. O. Tayloe, in fee-simple."

In our opinion this instrument has not the effect of a completed bargain and sale to convey the legal title to the property. Though it contains language sufficient to convey an estate *in præsenti*, yet, when taken in its entirety, it is very manifest that a further and more formal conveyance was contemplated. It would seem to be fully embraced by the principle of the cases of *Jackson* v. *Moncrief*, 5 Wend. 26; *Gray* v. *Packer*, 4 W. & Sergt. 17, and *Ogden* v. *Brown*, 33 Penn. St. 247, cited and relied on by the plaintiffs. However, the making the sale, the receipt of the purchase money, and the making and executing the deed or contract of sale, were acts fully within the scope of and authorized by the power of attorney, and were such acts as the parties had stipulated to ratify and confirm. Whether such contract could have been enforced as against the wife, either at law or in equity, is not the question presented in this case, and we therefore express no opinion upon that subject. On an application by the purchaser for the enforcement of the contract, questions quite different from those presented in this case would arise.

4. It is next contended, on the part of the defendants, that, whatever defect or imperfection may have originally existed in the instrument of the 29th of November, 1864, as an instrument of conveyance, that defect or imperfection was rectified and removed by the curative act of Congress of March 3, 1865, referred to in a previous part of this opinion. But in this contention we cannot concur. That act, by its terms, can only apply to and cure instruments intended as conveyances, and where the title was intended to pass, or was supposed to have passed, but the instruments proved to be defective or insufficient in the particulars specified. It was not intended to apply to an executory instrument or contract like that of the 29th of November, 1864. It was not intended to convert a mere contract

of sale and purchase, having the effect to vest in the purchaser a mere equitable estate, into a legal conveyance, to transfer and vest in the purchaser the legal title to the estate. There is no provision in the act, that, by fair construction, can be made to apply to this instrument, and so far change its character as to make it effective to convey the legal estate in the property.

5. Lastly, however, the instrument, and the sale evidenced thereby, have effect, by operation of the settled principles of equity, to vest in the purchaser an equitable interest or estate. The instrument itself is inchoate or incomplete as a conveyance, and did not divest the owners and vendors of the legal title ; but the bargain and sale, upon which the purchase money was paid, created an equitable estate, which a court of equity will not divest out of the vendee, in the absence of fraud. It is neither alleged, nor shown in proof by the plaintiffs, that there was fraud in the sale to Tayloe, or that the sale, at the time it was made, was for a price greatly inadequate ; nor is it alleged or pretended that the purchase money was not fully paid by the purchaser, as recited in the contract ; and the proof shows that the purchase money was paid over to Mrs. Ransom herself. And though Mrs. Ransom, after the close of the war, was in Washington, it is not shown that she ever objected to the sale, or that any person ever objected for her during her life. In such state of case, a court of equity *will not be active* in setting aside or vacating the sale. This is an application invoking the active interposition of a court of equity, in behalf of parties whose ancestor, under whom they claim, authorized the sale and received the purchase money, not only to annul the sale, but to oust those claiming under the *bona fide* vendee from the possession of the premises sold, after the lapse of more than a quarter of a century, and after the property has greatly enhanced in value, and the entire square been greatly improved, so as to make the present value of the entire square, according to the testimony, to be about $250,000.

In the case of *Mestaer* v. *Gillespie*, 11 Ves. 621, 624, Lord Chancellor ELDON states a principle that would seem to apply to this case. His lordship, in the course of an opinion, discussing fully the doctrine of equity as applied to bargain and sale, said: " In the case, for instance, of a conveyance by bargain and sale, which cannot be complete as a legal conveyance without enrolment, under Stat. 27 Hen. 8, ch. 16, yet that very instrument, only inchoate, and not complete to pass the property, is in this court evidence of *an agreement to convey;* and the conscience is bound to make further assurance; that obligation *arising from the payment of the money.*"

In this case, the attorney was held out by the power signed and duly acknowledged by Mrs. Ransom, jointly with her husband, as competent to sell and convey the property; and having sold and received the money, the parties ought in equity and good conscience to be estopped from questioning the sale, in the absence of fraud ; and if Mrs. Ransom was estopped, those claiming under her are equally so. In the bill, asking the court to declare both the power of attorney and the contract of sale null and void, without the allegation of fraud, there is neither the proffer to refund the purchase money received, the many years of taxes paid, nor to allow for any proportionate part of the value of lasting improvements placed upon the property. The case would seem to be fully embraced by the general equitable principle well established, and which is clearly stated by Mr. Justice STORY, in his work on Equity Jurisprudence, vol. 1, sec. 385, where the author says: " In cases where one of two innocent persons must suffer a loss, and, *a fortiori*, in cases, where one has misled the other, he, .who is the cause or occasion of that confidence, by which the loss has been caused or occasioned, ought to bear it. Indeed, cases of this sort are viewed with so much disfavor by courts of equity, that neither infancy nor coverture will constitute any excuse for the party guilty of the concealment or misrepresentation ; for neither infants

nor *femes covert* are privileged to practice deceptions or cheats on other innocent persons." And the learned author cites many authorities in support of the principle thus stated in his text.

This general principle of equity has been applied to various states of fact; and the Supreme Court of the United States have applied and enforced it in cases where the *equity* against alleged claims and supposed rights of married women, was certainly not stronger, or more manifest, than in the present case. The cases of *Bank* v. *Partee*, 99 U. S. 329, and *Bein* v. *Heath*, 6 How. 228, are instances, and furnish fair illustrations of the application of this general principle of equity as against the alleged claims and supposed rights of married women.

We are of opinion that the decree of the court below, dismissing the bill, was correct, and should be affirmed; and it is so ordered.

*Decree affirmed.*