## INSURANCE COMPANY *v.* DAVIS.

1. *New York Life Insurance Company* v. *Statham et al.*, 93 U. S. 24, reaffirmed.
2. Where, as in this case, the legal effect of a policy of insurance is that the premiums shall be paid to the company at its domicile, the indorsement on the margin of the instrument, that "all receipts for premiums paid at agencies are to be signed by the president or actuary" of the company, is not an agreement on its part to vary the condition of the contract, and to make any particular agency the legal place of payment, but is merely a notice to the assured that he must not pay to an agent, or at an agency, without getting a receipt signed by the president or actuary.
3. A resident of Virginia, who had been before the war a local agent of a Northern insurance company, refused to receive the renewal premium, due Dec. 28, 1861, tendered him upon a policy of insurance upon the life of a resident of that State. His refusal was based upon the ground that he had received no renewal receipts from the company, without which he could not receive the premium, and that the money, if received, would be liable to confiscation by the Confederate government. The evidence further failed to show that the company had consented to his continuing to act as such agent during the war, or that he did so continue. *Held*, that, waiving the consideration of any question in regard to the validity of an insurance upon the life of an alien enemy, such tender of payment did not bind the company.
4. The effect of a state of war upon the question of agency discussed.

ERROR to the Circuit Court of the United States for the Eastern District of Virginia.

This was an action on a policy of life insurance issued by the New York Life Insurance Company, a New York corporation, before the war, upon the life of Sloman Davis, a citizen and resident of the State of Virginia. The policy contained the usual condition, to be void if the renewal premiums were not promptly paid. They were regularly paid until the beginning of the war. The last payment was made Dec. 28, 1860. The company, previous to the war, had an agent, A. B. Garland, residing in Petersburg, Va., where the assured also resided; and premiums on this policy were paid to him in the usual way, he giving receipts therefor, signed by the president and actuary, as provided on the margin of the policy, which were usually sent to the agent about thirty days in advance of the maturity of the premium. About a year after the war broke out, the agent entered the Confederate service as a major, and remained in that service until the close of the war.

Offer of payment of the premium next due was made to the agent in December, 1861, which he declined, alleging that he had received no receipts from the company, and that the money, if he did receive it, would be confiscated by the Confederate government. A similar offer was made to him after the close of the war, which he also declined. He testified that he refused to receive any premiums, had no communication with the company during the war, and after it terminated did not resume his agency.

Sloman Davis died in September, 1867.

The plaintiff below was assignee of the policy, and claimed to recover the amount thereof, $10,000, upon the ground that he was guilty of no laches, and that at the close of the war the policy revived.

It is unnecessary to state, in detail, the proceedings at the trial. The plaintiff contended, and the judge instructed the jury, in substance, that they might infer from the evidence that the place of payment intended by the parties was at the residence of the plaintiff, and that, if the company did not furnish receipts to its agent, so that the premiums could be paid according to the terms of the policy, it was not the fault of the plaintiff; and, if he was ready and offered to pay his

premium to the agent, there could be no forfeiture of the policy, if within reasonable time after the war he endeavored to pay his premiums, and the company refused to receive them. On the other hand, the defendant contended that the war put an end to the agency of Garland, and the offer to pay the premium to him was of no validity, and the failure to pay rendered the policy void. This view was rejected by the court, and a verdict was rendered for the amount of the policy, less the amount of certain premium notes which had been given by the assured.

Judgment was rendered upon the verdict, and the company then brought the case here.

*Mr. Matt. H. Carpenter* for the plaintiff in error.

This case falls exactly within the principles declared in *New York Life Insurance Co.* v. *Statham et al.*, 93 U. S. 24, and the judgment below must be reversed. The outbreak of the war dissolved all executory contracts between citizens of one belligerent and those of the other, and put an end to all intercourse or dealings. *Matthews* v. *McStea*, 91 U. S. 7. The policy was, therefore, absolutely annulled, and no subsequent agreement between the assured and the company during the war could revive it. It follows that every agency of the company in any State declared to be in rebellion was terminated. The company could not authorize its agent to do what it was expressly forbidden to do by the President's proclamation of Aug. 16, 1861, issued in pursuance of the act of Congress of July 13 of that year.

But if the law were otherwise, there was no evidence from which the jury could find that the party to whom the renewal premium was tendered in December, 1861, was authorized by the company to act in its behalf after the commencement of the war. He refused the money, upon the ground that he had no authority to accept it.

*Mr. Samuel B. Paul, contra.*

Garland was duly appointed agent of the company, and acted as such. This authority was not revoked by the company after hostilities commenced. The presumption is, that the same relations continued between him and the company which had previously existed, and a payment or a tender of payment to him was as valid as if it had been made to the com-

pany. His agency was not revoked by the war. *Fretz* v. *Storer*, 22 Wall. 198.

MR. JUSTICE BRADLEY delivered the opinion of the court.

It is obvious that this case is nearly on all-fours with that of *New York Life Insurance Co.* v. *Statham et al.*, 93 U. S. 24, decided by this court at the last term. As we still adhere to the views there expressed, we do not deem it necessary to reiterate them. But the questions which received special discussion on that occasion were, whether a failure to pay the stipulated premiums involved a forfeiture of the policy, although such failure was caused by the existence of the war; and what were the mutual rights of the parties consequent upon forfeiture under such circumstances. The point which is now most strenuously relied on, namely, the supposed power of the agent of a Northern company to receive premiums in a Southern State in insurrection after the war broke out, and the supposed right of a policy-holder to tender them to such agent, although involved in the case, was not specially adverted to in the opinion of the court. We propose to add some observations on this branch of the subject.

First, however, a few words with regard to the position that there was competent evidence for the jury to infer that the place of payment intended by the parties was the place of residence of the assured. This, we think, is entirely untenable. The legal effect of the policy itself was, that payment should be made to the company at its domicile. The indorsement on the margin, which is much relied on by the plaintiff's counsel, has no such effect as he attributes to it. It is in these words: "All receipts for premiums paid at agencies are to be signed by the president or actuary." This is simply a notice to the assured, that, if he shall pay his annual premium to an agent, or at an agency, he must not do so without getting a receipt signed by the president or actuary of the company. How this caution can possibly be construed into an agreement on the part of the company to make any particular agency the legal place of payment of premium it is difficult to see. The circumstances show nothing but the common case of the establishment of an agency for the mutual convenience of the parties,

and do not present the slightest ground for varying the legal effect of their written contract. We think, therefore, that the charge was erroneous on this point. Of course, we do not mean to be understood as holding, that, as long as an agency is continued, a tender to the agent would not be valid and binding on the company.

But we deem it proper to consider more particularly the question of agency, and the alleged right of tendering premiums to an agent, during the war.

That war suspends all commercial intercourse between the citizens of two belligerent countries or States, except so far as may be allowed by the sovereign authority, has been so often asserted and explained in this court within the last fifteen years, that any further discussion of that proposition would be out of place. As a consequence of this fundamental proposition, it must follow that no active business can be maintained, either personally or by correspondence, or through an agent, by the citizens of one belligerent with the citizens of the other. The only exception to the rule recognized in the books, if we lay out of view contracts for ransom and other matters of absolute necessity, is that of allowing the payment of debts to an agent of an alien enemy, where such agent resides in the same State with the debtor. But this indulgence is subject to restrictions. In the first place, it must not be done with the view of transmitting the funds to the principal during the continuance of the war; though, if so transmitted without the debtor's connivance, he will not be responsible for it. Washington, J., in *Conn v. Penn*, Pet. C. Ct. 496; *Buchanan* v. *Curry*, 19 Johns. (N. Y.) 141. In the next place, in order to the subsistence of the agency during the war, it must have the assent of the parties thereto, — the principal and the agent. As war suspends all intercourse between them, preventing any instructions, supervision, or knowledge of what takes place, on the one part, and any report or application for advice on the other, this relation necessarily ceases on the breaking out of hostilities, even for the limited purpose before mentioned, unless continued by the mutual assent of the parties. It is not compulsory; nor can it be made so, on either side, to subserve the ends of third parties. If the agent continues to act as such, and his so acting is

subsequently ratified by the principal, or if the principal's assent is evinced by any other circumstances, then third parties may safely pay money, for the use of the principal, into the agent's hands; but not otherwise. It is not enough that there was an agency prior to the war. It would be contrary to reason that a man, without his consent, should continue to be bound by the acts of one whose relations to him have undergone such a fundamental alteration as that produced by a war between the two countries to which they respectively belong; with whom he can have no correspondence, to whom he can communicate no instructions, and over whom he can exercise no control. It would be equally unreasonable that the agent should be compelled to continue in the service of one whom the law of nations declares to be his public enemy. If the agent has property of the principal in his possession or control, good faith and fidelity to his trust will require him to keep it safely during the war, and to restore it faithfully at its close. This is all. The injustice of holding a principal bound by what an agent, acting without his assent, may do in such cases, is forcibly illustrated by Mr. Justice Davis, in delivering the opinion of this court in *Fretz* v. *Stover*, 22 Wall. 198. In that case, the agent had collected in Confederate funds the amount due on a bond. Having asserted that the agent had no authority to do this, the learned Justice adds: "If it were otherwise, then, as long as the war lasted, every Northern creditor of Southern men was at the mercy of the agent he had employed before the war commenced. And his condition was a hard one. Directed by his government to hold no intercourse with his agent, and therefore unable to change instructions which were not applicable to a state of war, yet he was bound by the acts of his agent in the collection of his debts, the same as if peace prevailed. It would be a reproach to the law, if creditors, without fault of their own, could be subjected to such ruinous consequences." These observations have a strong bearing upon the point now under consideration.

What particular circumstances will be sufficient to show the consent of one person that another shall act as his agent to receive payment of debts in an enemy's country during war, may sometimes be difficult to determine. Emerigon says, that

if a foreigner is forced to depart from one country in conse-
quence of a declaration of war with his own, he may leave a
power of attorney to a friend to collect his debts, and even to
sue for them.    Traité des Assurances, vol. i. 567.    But though
a power of attorney to collect debts, given under such circum-
stances, might be valid, it is generally conceded that a power
of attorney cannot be given, during the existence of war, by a
citizen of one of the belligerent countries resident therein, to
a citizen or resident of the other; for that would be holding
intercourse with the enemy, which is forbidden.    Perhaps it
may be assumed that an agent *ante bellum*, who continues to
act as such during the war, in the receipt of money or property
on behalf of his principal, where it is the manifest interest of
the latter that he should do so, as in the collection of rents and
other debts, the assent of the principal will be presumed, unless
the contrary be shown; but that, where it is against his inter-
est, or would impose upon him some new obligation or burden,
his assent will not be presumed, but must be proved, either by
his subsequent ratification, or in some other manner.

In some way, however it must appear, that the alleged
agent assumed to act as such, and that the alleged principal
consented to his so acting.    It is believed that no well-consid-
ered case can be found anterior to these life-insurance cases
which have arisen out of the late civil war, in which the exist-
ence or continuance of an agency, under the circumstances
above referred to, have been established contrary to the assent
of the alleged parties to that relation.    *Conn* v. *Penn, supra*,
is the leading authority on this subject in this country.    The
question in that case was whether the claimants of land in
Pennsylvania, under contracts of purchase from the propri-
etaries (the Penns) before the revolutionary war, were en-
titled to an abatement of interest during the war; and Justice
Washington held that this depended on the question whether,
during the war, the proprietaries, being alien enemies, " had in
the United States a known agent, or agents, authorized to re-
ceive the purchase-money and quit-rents due to them from the
complainants," the vendees.    To enable the parties to adduce
proof on this point, the court allowed further evidence to be
taken.    The same thing was held, at the same term, in the

case of *Dennison et al.* v. *Imbrie*, 3 Wash. 396, where Justice Washington says : " We think that if the alien enemy has an agent in the United States, or if the plaintiff himself was in the United States, and either of these facts known to the debtor, interest ought not to abate." It is obvious that, in these cases, the judge assumed that the relation of agency, if it existed, did so with the mutual consent of the parties thereto. And the same observation, it is believed, may be made with regard to all other cases on the subject, except some that have been very recently decided.

The same inference may be deduced from the cases decided in this court when the subject of payment to agents in an enemy's country has been discussed. Amongst others we may refer to the following : *Ward* v. *Smith*, 7 Wall. 447 ; *Brown* v. *Hiatts*, 15 id. 177 ; *Montgomery* v. *United States*, id. 395 ; *Fretz* v. *Stover*, 22 id. 198.

In some recent cases in certain of the State courts of last resort, for whose decisions we always entertain the highest respect, a different view has been taken; but we are unable to concur therein. In our judgment, the unqualified assumption on which those decisions are based — namely, " once an agent always an agent;" or, in other words, that an agency continues to exist notwithstanding the occurrence of war between the countries in which the principal and the agent respectively reside — is not correct, and that the continuance of the agency is subject to the qualifications which we have stated above.

Now, in the present case, except at the very commencement of the troubles, before the President's proclamation of non-intervention had been issued, and when it was yet uncertain what the differences between the two sections would amount to, there is not the slightest evidence that the company authorized Garland to act for it at all; and the latter expressly refused to do so when requested, both on the ground of having received no receipts from the company (which were his only authority for receiving payments), and of the liability of the funds to be confiscated in his hands. The war suspended his agency for all active purposes, and it could not be continued even for the collection of premiums without the defendant's consent; and

this, so far as appears, was never given, either expressly or by subsequent ratification.  Under these circumstances, it cannot be affirmed that the plaintiff could bind the defendant by a tender of payment to the supposed agent.  However valid a payment may be, if made to an agent in time of war, where he consents to act as such, and has the assent of his principal in so acting, an offer of payment cannot have any force or effect if neither of these circumstances exist.

Waiving, therefore, the consideration of any question that may be made with regard to the validity of an insurance on the life of an alien enemy, we think that in the present case there was not the slightest foundation for the court to charge, as it did in effect, that a tender of the premium to Garland in Petersburg was a good tender, and binding on the company.

We do not mean to say, that if the defendant had continued its authority to the agent to act in the receipt of premiums during the war, and he had done so, a payment or tender to him in lawful money of the United States would not have been valid; nor that a stipulation to continue such authority in case of war, made before its occurrence, would not have been a valid stipulation; nor that a policy of life insurance on which no premiums were to be paid though suspended during the war, might not have revived after its close.  We place our decision simply on the ground that the agency of Garland was terminated by the breaking out of the war, and that, although by the consent of the parties it might have been continued for the purpose of receiving payments of premiums during the war, there is no proof that such assent was given, either by the defendant or by Garland; but that, on the contrary, the proof is positive and uncontradicted, that Garland declined to act as agent.

*Judgment reversed, with directions to award a venire facias de novo.*

MR. JUSTICE CLIFFORD dissented.