FRANCIS McDONALD, Appellant, v. EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Appellee.

**INSURANCE:** Retention of Delinquent Premium. An insurance company irrevocably waives its right to declare a forfeiture of a policy because of the failure of the insured to pay the premium on or before the maturity date, when it receives and unreasonably retains the delinquent premium, with knowledge that it was paid by the insured in the reasonable belief, *induced by an unauthorized agent*, that he (the insured) might make such payment after said maturity date, and that such payment would preserve the life of his policy. To avoid such a result on the plea that the company retained the money on the condition that the insured should reinstate his forfeited policy by furnishing a certificate of continued good health, the company must affirmatively show that, upon receipt of the money, it *promptly* and *actually* brought home to the insured its intention to so hold the money, and thereby gave the insured an opportunity to consent to its new and self-created condition.

PRINCIPLE APPLIED: A policy provided that cashiers had authority to receive premiums, but that no agent had authority to waive time of payment or to reinstate a lapsed policy. Failure to pay a premium on or before March 10th forfeited the policy. Some few days before this date, the agent called at the office or home of insured at Des Moines, to collect the premium. The insured was in St. Paul. He was expected home at an early date. His wife so informed the agent, and offered to go to the bank and get the money and pay the pre-

mium. The agent said she need not do so, and that he would wait until the insured returned. It is conceded, *arguendo*, that this agent had no authority to bind the company by any such statement. The agent told the wife that, after the dividends on the policy were applied, the premium balance would be about $101. The wife went to her husband at St. Paul, where he was sick. She told him what the agent had said. The insured, on March 14th, sent said agent a check for $101, saying he would have remitted sooner, had he not understood from his wife that the matter could rest until he reached home. (This remittance was 68 cents short, but no point was ever made thereon.) The agent delivered this letter and check to the company's cashier at Des Moines. This was some two or three days after March 10th. The check was cashed. The cashier testified that at once, and repeatedly thereafter, he mailed a notification to the insured that the policy stood forfeited, and that the company held the money on condition, as provided by the policy, that the insured furnish a medical certificate of continued good health, as a basis for reinstating the policy. These notices were mailed to the insured at the address specified in the policy, and also to the insured at St. Paul. The company produced no evidence that the insured *actually* received these notices. The jury *might* have found that plaintiff had fairly shown that they had never been received. Some 40 days after the money was received, the company returned the money to the insured, and, by letter, explained that this was because insured had failed to furnish the required certificate. The insured kept the money. The jury *might* have found that the insured at this time was mentally incompetent to intelligently transact any business.

*Held*, a directed verdict in favor of the company was erroneous.

**INSURANCE:** Reinstating Waived Right. An insurance company 2, 6 which, by unduly retaining a delinquent premium, has waived its right to declare a forfeiture of the policy, may not reinstate its said right by returning the premium to the insured and causing him to retain it at a time *when he is mentally incompetent to transact business.*

PRINCIPLE APPLIED: See No. 1.

**INSURANCE:** Prohibited Waivers by Agents. A policy condition 3 which is for the sole benefit of the insurer may be waived by any agent who has authority to act in reference thereto, *even though the policy provides to the contrary.*

PRINCIPLE APPLIED: See No. 1.

**PAYMENT:** Retention on Uncommunicated Condition. One who receives a payment with knowledge that it has been made on a particular condition will be presumed to irrevocably assent to such condition, unless he affirmatively shows that, upon receipt of such payment, he *promptly* and *actually* brought home to the one making the payment the intention to hold it on some other and different condition.

PRINCIPLE APPLIED: See No. 1.

**INSURANCE:** Provisions Governing Notices. A policy provision that notices to the insured shall be sent to a designated address has reference solely to notices which give *effect* to the terms of the contract,—not to notices as to which the law requires *actual* notice, and which could not have been contemplated by the parties when the policy was issued.

PRINCIPLE APPLIED: See No. 1.

**INSURANCE:** Reinstating Waived Right.

**INSURANCE:** Authority of Agents. The authority of an insurance agent, as far as the public in concerned, must be measured, not so much by the terms of his employment or by the terms of the policies, *as by the things which the principal permits him to do.* Evidence held to show that the agent in question was a "general" agent.

*Appeal from Clarke District Court.*—Thomas L. Maxwell, Judge.

November 16, 1918.

Rehearing Denied April 10, 1919.

Action at law to recover upon a policy of life insurance. There was a directed verdict and judgment for the defendant, and the plaintiff appeals.—*Reversed and remanded.*

*O. M. Slaymaker,* for appellant.

*Henry & Henry* and *Temple & Temple,* for appellee.

Weaver, J.—The plaintiff sues as assignee of Katherine E. McKee, the widow of Samuel C. McKee, deceased. Many

of the material facts are the subject of no dispute. Among them we mention the following: On February 15, 1915, the defendant life insurance company issued its policy for the sum of $2,000 upon the life of Samuel C. McKee, payable to his wife, Katherine E. McKee. At that time, McKee paid the first year's premium, $116, all or in part by giving his promissory note, which he subsequently took up. The policy provided for the payment of subsequent annual premiums at the same rate on the 9th day of February of each year, until 20 of these premiums had been paid. The policy also provided for payment of dividends annually, which sums could, at the option of the insured, be "applied toward the payment of premiums." Among other stipulations of the instrument, it was provided that "all premiums are payable in advance at the home office, or to any agent or agency or cashier of the society, upon delivery, on or before their due date of a receipt," signed by an executive officer of the company. It was also provided that a grace of 31 days, subject to an interest charge of 5 per cent per annum, would be allowed for the payment of every premium after the first, during which period the policy should remain in force. Another provision was as follows:

1. INSURANCE: retention of delinquent premium.

"Agents are not authorized to modify, or, in event of lapse, to reinstate this policy, or to extend the time for payment of any premium or installment thereof."

Samuel C. McKee died on September 10, 1916. Very soon after the death of the insured, the widow, by her counsel, notified defendant of his death, called upon it to furnish blanks for the formal proof thereof, and demanded payment, according to the terms of the contract. The defendant acknowledged receipt of these communications, but alleged that the policy had been forfeited by the failure of the insured to pay the second annual premium, and for this reason, it refused to make payment or to acknowledge any

liability therefor. Suit having been brought to enforce payment, the company made defense on the ground indicated. Trial was had to a jury, and, at the close of all the evidence offered by the respective parties, there was a directed verdict and judgment for the defendant.

I.   The vital inquiry in this case is whether, as a matter of law, the plaintiff failed to make a case on which she was entitled to the verdict of a jury. The plaintiff denies that there was any default in the payment of the second annual premium. Her testimony tends to show that she and her husband were residents of Des Moines, Iowa; that the policy was originally issued upon an application obtained from McKee at Des Moines by one J. A. Blum, an alleged general agent of the defendant's, to whom the first premium was paid; that, about the time the second premium payment fell due, and before the contract days of grace had expired, McKee being away from home, Mrs. McKee, the beneficiary in the policy, saw Blum, and told him of the absence of her husband and of her expectation of his early return, and said to the agent that, if he wanted the payment then, she would go to the bank and get the money for him, and he replied that it was not necessary, and he would wait until Mr. McKee came home. This conversation she says was repeated several times. She further says that Blum informed her that, after applying the first dividend on the premium, it would leave a remainder due thereon of about $101, and that she made a memorandum of it. Soon thereafter, and about the expiration of the 31 days of grace, she went to her husband, who was sick at St. Paul, Minnesota, and reported to him her understanding had with Blum, when he undertook to make payment of the premium in the following manner: On March 14, 1916, 33 days after the due date of the premium, he wrote a letter to Blum, and enclosed to him a check for $101. The letter and check were in the following form:

"St. Paul, Minnesota, March 14, 1916.

"J. A. Blum:    Please find enclosed check for $101.00. I know there is a small amount over this, but whatever it is, will pay when I come home. Mrs. McKee said you would let the matter rest until I came home, or I would have mailed check sooner.

"Yours truly,
"S. C. McKee."

"Dallas Center, Iowa, March 13, 1916.
"Bank of Dallas Center,                    72-759
"Pay to Equitable Life Assurance Company, or order, $101.00 one hundred and one and no/100 Dollars.
"[Signed] Samuel C. McKee."

"Insurance premium due February, 1916, $2,000.00 policy."

This check was received by Blum and passed over, with McKee's letter, to the company's cashier at Des Moines, by whom it was endorsed, and deposited to the credit of the company, and; through the usual course of banking business, was collected from the bank at Dallas Center, on March 21, 1916. In this connection, the agency cashier, who received the check from Blum, testifies that, on the same day, he wrote and mailed a letter to McKee, enclosing therein a conditional receipt for the money so remitted. The letter and receipt, he says, were in the following form:

"March 18, 1916.
"Samuel C. McKee, St. Paul, Minn.

"Dear Sir:    Your letter of the 14th written to our Mr. J. A. Blum, enclosing a check for $101.00, in connection with the premium due February 9, 1916, on policy No. 1948164, has been referred to the undersigned for attention, and in this regard you should be advised that the amount of your check has been placed in escrow, for which I enclose a proper receipt. I desire to request that you kindly sign the attached declaration of health, which must be at this office

no later than the 9th proximo, when restoration of this policy will have immediate attention. You have been previously advised that the said policy lapsed as to February 9th.

"In reference to your remittance of $101.00, kindly be advised that it is sixty-eight (68) cents short. This is made up as follows:

| | |
|---|---:|
| "Premium ......................:| $116.40 |
| Less dividend ................... | 15.30 |
| | $101.10 |
| Int. on premium ........... ..... | .58 |
| | $101.68 |
| Credit by check ............... | 101.00 |
| Short | .68 |

"Receipt.

"The Equitable Life Assurance Society of the United States.

"165 Broadway, New York City.

"Receipt No. 66051.

"Agency at Des Moines, Ia., 3/18/1916.

"Received from Samuel C. McKee one hundred one & 00/100 dollars ($101.00), offered for on account annual prem. less dividend due Feb. 9th, 1916, policy No. 1,948,164—reinstatement pending.

"Said sum is received only for transmission to the home office of the society in New York, for the account of the depositor, and the society is in no way committed thereby to the acceptance thereof for the purpose offered nor to any action in the premises, and nothing herein or connected with the receipt of said sum shall be held to waive any default in payment of any premium, interest or other sum due, or to extend the time for payment of any premium, interest or other sum, or in any manner to affect the rights of the society under any policy or contract of insurance or otherwise. If the said amount be not accepted by the so-

ciety for the purpose offered it will be returned to the depositor upon demand.

"C. H. Nicolet,

"D. S. Agency Cashier."

There is also the copy of another letter, of same date and of similar import, directed to McKee at "508 Observatory Building, Des Moines, Iowa," which the cashier testifies he wrote and mailed. Still other communications put in the record were mailed to McKee, he says, at different dates during the spring and summer of 1916, urging and advising him to take the necessary steps for the reinstatement of his insurance. The same witness further says that, on April 26th, 42 days after the receipt of the money, he sent McKee another letter, as follows:

"April 26, 1916.

"Samuel C. McKee,

"508 Observatory Building, City.

"Dear Sir:

"Re Policy No. 1,948,164.

"We are refunding herewith your deposit of $101.00, in connection with the premium due February 9, 1916, on this policy, and beg to state that in your not furnishing us with a medical certificate of your good health, we have been unable to consider the re-instatement of this policy, which lapsed February 9, 1916, for the nonpayment of the premium then due. Therefore, we are making the return of this deposit.

"We will be glad to open this matter up again on receiving the requirements as set forth above, or in arranging a re-instatement, and trust you will make such application at once.

"Yours truly,

"C. H. Nicolet, Cashier."

This letter enclosed a check for $101, payable to the order of Samuel McKee, "for return deposit a/c policy No.

1948164, as per statement of account No. 24110;" and endorsed thereon were the following printed words:

"Received of the Equitable Life Assurance Society of the United States the within amount in settlement of account as stated."

It is stipulated by the parties, in the record of the trial, that, on May 3, 1916, this check was deposited to the credit of McKee in the National Bank of Commerce of St.

2. Insurance: re-instating waived right.

Paul, Minnesota; that it was duly collected, and proceeds credited to McKee; and that the same has been drawn from the bank by his administrators. The plaintiff offered evidence from which the jury could find that neither the alleged letter of March 18th from the company's cashier, notifying McKee that the check sent to Blum was accepted only upon certain conditions, nor any of the other communications of a later date, alleged to have been sent to him by the company, were ever received by or made known to McKee, with the exception of the one of April 26th, containing the check for the return of the $101. To counteract the effect of McKee's act in receiving the company's check for a return of the money and placing the same in the bank to his credit, the plaintiff offered evidence tending to show that her husband was, at the time, sick, and so enfeebled in body and mind as to be incompetent for the transaction of business, and unable to intelligently comprehend the effect of such action upon his rights. This showing was met by the defendant with other evidence, tending to show the mental competency of the insured at that time. This issue was clearly one of fact, which, unless plaintiff is to be held, as a matter of law, to have failed to establish either payment or waiver of payment of the second annual premium within the time prescribed by the policy, should have been submitted to the jury.

It appears to have been the opinion of the trial court

that Blum, even if he be regarded as a general agent, was
not shown to have any authority to waive or extend the
time for payment of the premium; and that, as it was con-
ceded that the payment of $101 was not remitted until two
or three days after the expiration of the grace of 31 days,
there was a forfeiture of the insurance.   The court also
held that the act of the company's cashier in receiving and
collecting the check from McKee could not be held a waiver
of the forfeiture, and that the acts of the cashier and
the company in respect thereto must be construed with
reference to the conditions embodied in the cashier's receipt
for the money, to the effect that such payment was accepted
subject to the production of a proper health certificate by
McKee.   Having this view of the record, the court further
held that, forfeiture being complete, the mental condition
or competency of McKee at the time the money was returned
could have no material bearing upon the rights of the par-
ties.   To the exceptions taken to these rulings we now turn
our attention.

Is there any evidence from which we can say that the
insured was justified in relying upon the authority of Blum
to accept payment of the premium after it became due?

That the company had the right to stand upon the terms
of its policy, and refuse to receive payment of the premium
after the expiration of the grace of 31 days therein provided
for, cannot be denied.   It is equally true
3. INSURANCE: pro- that these restrictions and limitations are
hibited waivers
by agents.     provided by the insurer for its own protec-
tion, and it may waive any or all of them,
if it shall so elect.   If it does waive them, or any of them,
and the insured acts thereon, then the rule, regulation, or
condition so waived ceases to be available as a defense to
an action on the policy.   The company, being a corporation,
can manifest its intent through its officers and agents only;
and, when the question of an alleged waiver arises, its acts

by and through such officers and agents become a matter of material inquiry.   Limitations upon the authority of agents with respect to payment of premiums are quite commonly, if not generally, found in life insurance policies; and the question whether, in given instances, they may be held to have been waived, has often had the consideration of the courts.

It may be said at the outset that the precedents, though numerous, fall into two more or less widely diverging lines. In some of the older states, the courts early construed policy limitations and conditions with respect to the authority and acts of the insurer's agents quite strictly, and policy holders and beneficiaries seeking to establish waivers thereof found little encouragement in the decisions.   It was not long, however, before the disinclination to allow forfeitures of insurance save for clearly good cause led to a more liberal policy, which is now observed by practically all the courts of the country.   In our own state, the question had its first thorough examination in *Viele v. Germania Ins. Co.*, 26 Iowa 9, where it was held, in substance, that, no matter how strict the conditions of the policy, they are made by the insurer, for its own protection and benefit, and may be waived or disregarded if it so elects; and, as a corporation can act only by or through its officers and agents, a waiver by them may, under some circumstances, become binding upon the corporation which they represent.   To quote from the decision in the cited case:

"Circumstances proving that the party treated the contract as subsisting, and not forfeited, a course of dealing consistent only with that hypothesis, and acts and declarations whereby the other party was induced to believe that the condition was dispensed with, or forfeiture waived, will be sufficient to preclude the setting up of the breaches of the condition as a defense."

And without further multiplying citations upon this

question, we quote from the Supreme Court of the United States the statement of the generally recognized rule, as follows:

"Courts are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture, or an agreement to do so, on which the party has relied and acted. Any agreement, declaration, or course of action on the part of an insurance company which leads a party insured honestly to believe that, by conforming thereto, a forfeiture of his policy will not be incurred,  *  *  *  will and ought to estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract." *Insurance Co. v. Eggleston,* 96 U. S. 572.

This is not saying that the mere promise or agreement of the agent, contrary to the express terms or limitations of the policy, will operate to estop or prevent the company from insisting upon a forfeiture; but if the insured, to the knowledge of the company, relies and acts upon such promise or agreement, and in such reliance pays his money to the company, or if the company so acts in the premises that the insured, as an ordinarily reasonable person, is led to believe that it waives the condition or waives the forfeiture, the courts will be prompt to declare the waiver effectual. We quote again from the opinion of this court in the *Viele* case, where it says that, although the policy explicitly declares that, upon the breach of certain conditions, the policy will become void, yet this means no more than that, upon the violation of such condition, the policy will become void at the option of the insurer; and if the company waives the breach, "the contract stands as if no such breach had occurred." Or, as said by the Minnesota court:

"A contracting party cannot so tie his own hands, so restrict his own legal capacity for future action, that he has not the power, even with the assent of the other party, to bind or obligate himself by his further action or agreement,

contrary to the terms of the written contract." *Lamberton v. Connecticut F. Ins. Co.*, 39 Minn. 129 (39 N. W. 76).

Speaking of a policy provision providing that no waiver of its terms could be made except by the insurer's president or secretary, and then to be endorsed in writing upon the policy, the Wisconsin court has said:

"We must hold, however, that such attempted restrictions upon the power of the company or its general officers or agents, acting within the scope of their general authority, to subsequently modify the contract and bind the company in a manner contrary to such previous conditions in the policy, are ineffectual. Especially is this true in respect to a foreign insurance company, whose officers are practically inaccessible to the assured." *Renier v. Dwelling House Ins. Co.*, 74 Wis. 89 (42 N. W. 208); *Dick v. Equitable F. & M. Ins. Co.*, 92 Wis. 46 (65 N. W. 742).

Acts and conduct which are insufficient to constitute a technical estoppel against a forfeiture may yet be sufficient to effect a waiver. *Hollis v. State Ins. Co.*, 65 Iowa 454; *Corson v. Anchor Mut. F. Ins. Co.*, 113 Iowa 641; *Bloom v. State Ins. Co.*, 94 Iowa 359. In *King v. Council Bluffs Ins. Co.*, 72 Iowa 310, 315, this court reaffirms the *Viele* case, saying:

"It has become the settled law of this state, and no one now questions its binding authority upon this court. Under the doctrine of that case, any conditions of a contract of insurance may be waived by the insurance company. The only question about which any question can arise is whether the company had notice, and thereby waived the conditions. This is a question of fact; and if the evidence warrants the finding that it did have such notice, it is an end of the case. And this depends upon the relation Ayers (the alleged agent) sustained to the company."

Without further reference to the precedents, of which there are many, upon this phase of the case, let us now turn

to a few cases in which a practical application of the prin-
ciple has been made. In *Insurance Co. v. Eggleston*, 96 U. S.
572, action was brought upon a life insurance policy which,
as in this case, was conditioned upon prompt payment of the
yearly premium as it should fall due.  It was also, as in this
case, further provided that "agents for the company are not
authorized to make, alter, or discharge contracts, or waive
forfeitures." The insured resided at Columbus, Mississippi,
and the policy was procured through a local agent, to whom
the first premium was paid.  Before the next premium was
due, the agency at Columbus was revoked, and the insured
was notified to pay it to a firm of agents at Savannah,
Georgia.  Later, he was notified to pay premiums to an agent
at Vicksburg, Mississippi, and this he did for several years,
but failed to pay the one falling due in November, 1871;
and with this premium unpaid, he died, the following Jan-
uary.  The only showing made in excuse for this default was
the testimony of the son, and the banker through whom the
deceased had made former payments, that, if any notice had
been given to deceased as to where and to whom to make
the payment, they knew nothing of it, and that the insured
had the money to pay the premium, had notice been given.
It was also shown that, *after the premium was due and pay-
able*, the banker telegraphed to the Savannah agency, in-
quiring to whom payment should be made, and received an-
swer to apply to the Vicksburg agency;  and from this
agency, directions were received to make payments to a cer-
tain subagency at Macon, Mississippi, where the receipt
would be found.  The money was then sent to the agents
at Macon, who refused to accept it unless accompanied by
a health certificate.  This demand could not be complied
with, for the insured was then sick, and died a few days
later.  The company also produced a witness from the
agency at Macon, who testified that, before the premium
became due, he mailed to the insured a notice addressed to

him at his home in Columbus, thirty miles from Macon, to make the payment to the agents at that place, and that they held the proper premium receipt. It will be seen that the cited case is, in many essential respects, not unlike the case at bar. They are quite alike in the fact that the waiver relied upon in each case is to be found, if at all, in the acts or omissions of agents, and that, in each, the policy provides that the company's agents have no power to waive forfeitures. It is with reference to the case as above stated that the court uses the language hereinbefore quoted, concerning the disposition of the courts to refuse to uphold forfeitures where the policy holder has been misled by the acts of the company and its agents. In that case, the trial court charged the jury that, if payment of premiums before the default had been made by the insured to such agents as the company had, from time to time, given him notice, and that no notice was given before this last premium fell due, where and to whom to pay it, and that, as soon as he did receive such notice, he did tender payment, and that the failure to pay before default was caused by his failure to receive the proper notice, then the policy was not forfeited. This instruction was sustained on the appeal, and the company held liable on the policy. It will be observed that there was a conceded failure to pay the premium when due, and that the tender of payment was not made until several weeks after the default, and while the insured was at the door of death. The policy in that case contained no provision requiring the company to give notice each year where or to whom payment of premium should be made. Indeed, it had but recently been held by the same court, in construing another policy of the same company, that the legal effect of the contract was to make the premiums payable at the home office of the company in New York City (*Insurance Co. v. Davis,* 95 U. S. 425 [24 L. Ed. 453]) ; yet it was here held that, under the circumstances stated, the failure of the com-

pany or of its agent to give the notice was a waiver of the right to forfeit the policy for nonpayment of a premium.   It is also quite pertinent here to notice that, as in the case at bar, the agency charged with the collection offered direct evidence that it did send the notice by mail in due time to the insured at his proper address, and that the evidence that such notice was not delivered or received by the insured is even less definite and conclusive than is the evidence upon the like proposition in the instant case; and yet the question of fact so raised was found sufficient to take it to the jury.   In *Insurance Co. v. Norton*, 96 U. S. 234 [24 L. Ed. 689], the policy, like those already mentioned, provides that agents have no power or authority to waive forfeitures; and it was held that, where the agents were accustomed to disregard this restriction, and to extend the time for payment of premiums, a forfeiture for nonpayment on contract time was waived.   Speaking of the policy restrictions, the court says:

"These terms, had the company so chosen, it could have insisted on.   But a party always has the option to waive a condition or stipulation made in his own favor.   The company was not bound to insist upon a forfeiture, though incurred, but might waive it.   *   *   *   And whether it did exercise such option or not was a fact provable by parol evidence, as well as by writing."

In a subsequent case, *Phoenix Ins. Co. v. Doster*, 106 U. S. 30 (27 L. Ed. 65), the cases already cited are reaffirmed; and it was there held that, where the policy permits the insured to apply his dividends as a payment upon his annual premiums, a forfeiture would not take place until the insured had been notified of the applicable dividend, and of the remainder necessary for him to pay in addition thereto.   See also, to the same general effect, *Hartford L. & Ann. Ins. Co. v. Unsell*, 144 U. S. 439 (36 L. Ed. 496).   It has been held by the Tennessee court that, where the insured had

been led to omit the payment due, because of the agent's direction to wait until called upon by the collector, there was no forfeiture. *Aetna L. Ins. Co. v. Fallow,* 110 Tenn. 720, 736 (77 S. W. 937, 941). Also, as having more or less direct bearing upon the questions raised by this appeal, see *Arnold v. Empire Mut. A. & L. Ins. Co.,* 3 Ga. App. 685 (60 S. E. 470, 475) ; *Union Cent. L. Ins. Co. v. Whetzel,* 29 Ind. App. 658 (65 N. E. 15, 17) ; *Sweetser v. Odd Fellows Mut. A. Assn.,* 117 Ind. 97; *Coile v. Order of U. C. T. of A.,* 161 N. C. 104, 107 (76 S. E. 622, 623) ; *Grand Lodge v. Smith,* 76 Kan. 509, 514 (92 Pac. 710, 712) ; *Graham v. Security Mut. L. Ins. Co.,* 72 N. J. L. 298 (62 Atl. 681) ; *Warnebold v. Grand Lodge,* 83 Iowa 23; *Mobile L. Ins. Co. v. Pruett,* 74 Ala. 487, 498; *McCorkle v. Texas Ben. Assn.,* 71 Tex. 149, 155 (8 S. W. 516, 519). Quite in point, in fact and in principle, is the very recent case, *National Life Ins. Co. v. Clayton,* (Okla.) 173 Pac. 356.

In the light of the law as thus indicated, let us look to the facts which the jury could have found under the evidence. It could have found that, very shortly before the period of grace provided for by the contract expired, the company's agent, Blum, went to the office of the insured, for the purpose of collecting the second yearly premium; that he there met Mrs. McKee, the beneficiary named in the policy, who informed him that her husband was temporarily absent, and expected to return, but, if the agent desired, she would go to the bank and get the money to pay him; that the agent said it was not necessary, and that the matter could wait until McKee returned; that, very soon thereafter, the wife went to her husband in St. Paul, and there informed him of the understanding with the agent, and, relying and acting thereon, he wrote the letter and enclosed the check set out in the foregoing statement, and mailed it to Blum; that the letter was received at the agent's office in the city of Des Moines, and that both papers, letter, and

check were passed into the hands of the company's district treasurer at the same agency; that, although the check was so sent about three days after the expiration of the period of grace, the treasurer received it, cashed and placed the same to the company's credit, and retained it for a period of about 40 days, before returning it to McKee.   The jury could also have found that McKee sent the check, honestly believing and understanding that, although the payment was three days in default, yet the favor extended to him by the company or by the agent or both was keeping the door open for its receipt.   That understanding and belief, whether well or ill founded, was clearly indicated on the face of the letter and check, and neither Blum nor the treasurer could have failed to perceive it.   They were self-explanatory.   He was not asking or demanding re-instatement.   He did not understand that re-instatement was needed.   He was tendering a payment which he believed he had an unconditional right to make, and thereby preserve and extend his insurance for another year.   Whatever may have been the true relation of Blum to the company, or the technical extent of his powers as an agent, there is no question that the treasurer was authorized to represent the company in the collection of premiums, and his acts in transacting the business entrusted to him were the acts of the company.   Let it be conceded, for the purposes of this case, that the company, through him, being thus advised of the act of Blum and of McKee's reliance and action thereon, could have repudiated the act of Blum, as being unauthorized, and treated the insurance as forfeited, and because thereof could have rightfully refused to accept or retain the money.   This it did not do.   It took the money.   True, the cashier asserts that he refused to accept it as payment of the premium, but that he collected the check and continued to hold the money conditionally only, to be finally accepted if the insured should satisfy the company's demand for a health certificate.   But

the payment had not been tendered or made for any such purpose. The condition was one imposed or sought to be imposed by the company, without any agreement or consent of the insured, either express or implied. It was a use of the money for another and different purpose from the one for which it had been remitted. The rule of

4. PAYMENT: re-
tention on un-
communicated
condition.

law, as well as of reason, required the company, if it proposed to assert a forfeiture of the insurance, to return the money at once to McKee, stating the reason for the refusal to accept. Receipt and retention by the insurer of an overdue premium is universally held to operate as a waiver of forfeiture for the failure to make such payment on time, and the waiver will be effectual here, unless this result is to be avoided by the defendant's evidence that it accepted the money only on the conditions named. We are aware that some courts have held that a temporary retention of an overdue payment, to give the insured opportunity to secure a re-instatement, will not, under all circumstances, waive the default; and, without stopping to consider the soundness or propriety of this rule, we may, for the purposes of this appeal, concede the authority of the precedents referred to. But even with this concession, the question remains one of fact, and not of law. No case goes to the extent of saying that the company may so retain the money as a matter of right, without the consent, express or implied, of the person insured who pays it. Every principle of law and fair dealing requires that, if the company proposes to reject the payment of the premium and hold the money for another purpose, it shall promptly notify the insured of that fact, and give him opportunity to say for himself whether he desires the money to be so used. Retention of the money an unreasonable length of time without giving such notice will necessarily work a waiver of the forfeiture. It is true, the cashier testifies that he did send McKee a notice by mail, addressed to him both at Des

Moines and St. Paul, that the money was being held condi-
tionally; but there is no evidence that such notice was ever
received or delivered.   On the contrary, there is evidence
fairly tending to negative any such receipt.   Assuming, then,
that no actual notice of that nature was ever given to the
insured until about the time the money was returned, some
40 days after its payment, what is the effect of such omis-
sion or delay?   The law applicable to such a situation is
clearly and forcibly stated by the Massachusetts court in
*Shea v. Massachusetts Ben. Assn.,* 160 Mass. 289, where the
insurer received the money for an overdue premium, and, as
in this case, claimed to have receipted for it conditionally,
awaiting the production of a health certificate, and to have
sent the same to the insured by mail.   In holding the plea
unavailable to the defense, the court says:

"The money was tendered unconditionally; and, if the
company should retain it without objection, it would be held
to assent to the terms of the payor.   One who receives and
retains money which is sent to him to be kept on certain
terms must be deemed to assent to those terms if he keeps
the money, unless he makes it known to the sender that he
will only keep the money on some other and different terms;
and, if he seeks to establish different terms, while keeping
the money, it rests upon him to make that fact known.   If
the defendant would establish different terms from those
upon which the money was sent, it must do something to
make it known that its acceptance and retention of the
money were conditional.   It could not impose a condition
binding upon Shea, merely by determining in its own mind
to do so.   A secret vote of the directors that they would keep
the money, but that the payment should be deemed valid
only in case Shea was then in good health, would be of no
avail.   An uncommunicated condition is no condition.   The
company must certainly take some step to inform Shea or
his agents that the money, though retained, would not be

held upon the terms upon which it was sent. The duty arose from its actual retention of the money which was sent on specified terms. To keep the money, and insist on different uncommunicated terms, would savor of fraud. Good faith required that the defendant should not remain passive, but should do something, if it objected to the payment's being considered unconditional. But then, how much was it incumbent on the defendant to do? Must it be held to bring notice home to Shea or his agents, or was its duty satisfied by merely posting its communication in the mail? There is nothing in the policy, or in the rules of the company annexed thereto, or in the by-laws, providing that such an effect shall be given to mailing a communication of this character. No fact is stated from which a request can be implied or inferred from Shea that the company should communicate such a condition in that way. In the absence of any stipulation in the contract between the parties or in the rules of the company, or of any express or implied request on the part of Shea or his agents, or those acting for him, we are acquainted with no rule of law under which he can be held to be bound by the defendant's act of imposing a condition upon its acceptance and retention of the money, unless notice of such condition is actually brought home to him, or to those acting for him. There is some analogy between this case and the ordinary case where one is under a duty to make a payment of money. If he uses the mail for that purpose, without express or implied authority, he must take the risk of the payment reaching its proper destination. *Gurney v. Howe*, 9 Gray 404; *Crane v. Pratt*, 12 Gray 348."

The same rule is recognized in *Rockwell v. Mutual L. Ins. Co.*, 20 Wis. 356. Such, also, is the effect of the holding in the *Eggleston* case, supra, and in *McQuillan v. Mutual Reserve F. L. Assn.*, 112 Wis. 665, 671.

Counsel for appellant endeavor to avoid the effect of this rule by saying that, in the contract of insurance in this

case, it was agreed that notices to the assured should be
sent to a designated address in Des Moines,
and that the cashier of the company testi-
fies that he did send a conditional receipt
and notice to such address, and that this
is all which could be required.   Our examination of the
contract, as shown by the printed record, does not disclose
any agreement of that nature; and even if it did, we do not
think it would affect the rights of the parties as to this par-
ticular notice, if one was, in fact, mailed.   The agreement,
if any, as to post-office address should be limited in its ap-
plication to such notices as may at any time be required to
give effect to the terms of the contract.   There is no provi-
sion in the contract by which the company reserved the right
to retain a rejected payment of premiums for any other
purpose, and if it desires or proposes so to do, it ought to
be held to the rules which the law provides for cases of that
nature.

5. **Insurance:**
**provisions gov-**
**erning notices.**

It follows that, under the evidence in this case, ques-
tions of fact arose whether the company did or did not, in
truth, elect to insist upon the forfeiture of the insurance;
whether its retention of the money of the insured was or
was not conditional upon the production of a satisfactory
health certificate and the re-instatement of his insurance;
whether notice of such condition was or was not given to
the insured; and if so, whether it was given with reasonable
promptness.   If, upon these questions, the findings were in
plaintiff's favor, then a further finding that the company
waived the alleged forfeiture could not properly have been
set aside, as being without support in the record.

II.   Thus far, we have given no attention to the effect
of the return of the money upon the rights of the parties.
That the money was eventually returned was conceded, and

if McKee was, at that time, of sound mind,
**6. Insurance:** and competent to transact business intelli-
re-instating
waived right. gently and understandingly, his act in ac-
cepting and receipting for it in satisfaction
of his claims under the policy would doubtless be a com-
plete defense to this action; for, no matter how perfect his
right to deny the forfeiture of his insurance, he had also
the right to compromise or settle and release his claims, in
consideration of a return of his payment. It is alleged, how-
ever, and evidence was offered tending to prove, that he was
then unsound in mind and body, and by reason thereof, was
unfit and incompetent to enter into a binding agreement of
that nature. If the jury should find this to be true, then
it would be the right of the claimant under the policy to
have that transaction and agreement treated as being with-
out force or effect; and in that event, the other issues in the
case will be determined as if the alleged agreement of set-
tlement had never been made. *Hicks v. Northwestern M. L.
Ins. Co.,* 166 Iowa 532; *Nutter v. Des Moines L. Ins. Co.,*
156 Iowa 539.

III. Counsel on either side have given considerable at-
tention to the question whether Blum was a general or spe-
cial agent of the company. We have not given the question
any prominence in the discussion, because
**7. Insurance:** we have not thought it vital to a determina-
authority of
agents. tion of the appeal. We think, however, that
the evidence would warrant a finding that
his agency was general, within the meaning of that word as
used in the law of agency. He, with the cashier, appears to
have had general, though possibly not exclusive, charge of
the defendant's business in the central district of Iowa, con-
sisting of a dozen or more counties. It appears, also, that
his title was that of agency manager; that he had the power
to appoint, superintend, and remove local agents; that he,
himself, took McKee's application for the insurance, and sub-

scribed his name upon the printed blank over the words, "General Agent;" that he allowed McKee to give his note or notes for the first premium, which he afterwards collected, and when the second year's premium became due, he took up the matter of collecting that, also.   Moreover, the defendant was a New York corporation, and, so far as the record discloses, the agency manager and the cashier were its only representatives at Des Moines through whom it came in touch with its policy holders and patrons.   Life insurance agents are rarely, if ever, "general," in the sense that they execute and deliver policies, as is often done in the business of fire insurance, but they often have and exercise general control or power with respect to the particular branch of the business committed to their hands, and to that extent, at least, they are general agents.   The fact that the agent represents a foreign company, and is the only visible or only convenient medium of approach to such corporation, has been recognized by the courts as a fact to be considered in such cases.   See, for example, *Insurance Co. v. Wilkinson,* 13 Wall. 222 (20 L. Ed. 617), where the subject is discussed with characteristic clearness and vigor by Mr. Justice Miller.   See, also, *Viele v. Insurance Co.,* supra, and note to *Johnson v. Aetna Ins. Co.,* 107 Am. St. 92, 122.   The authority of agents, so far as the public with whom they deal is concerned, is controlled not so much by the terms of their employment, or even by the terms of the policies which they procure for applicants, as by the things which the principal permits them to do, and by the nature and extent of the business for which they are employed, and permitted to carry on.   But, as we have before said, so far as the agent Blum is concerned, if he transcended his powers in promising an extension of time of payment a few days, and thereby induced the insured to send him the check, and the cashier, acting for the company, and knowing that fact, received and retained the money, it would be a ratification

of the unauthorized act, and the forfeiture would thereby be waived, unless that effect is found to be obviated, either by prompt notice to the insured or by a subsequent valid settlement and discharge of his claim, as hereinbefore indicated. *Hodsdon v. Guardian L. Ins. Co.,* 97 Mass. 144.

The motion of the defendant for a directed verdict should have been denied.

For the reasons stated, the judgment of the district court will be reversed, and cause remanded for a new trial. —*Reversed and remanded.*

Preston, C. J., Gaynor and Stevens, JJ., concur.