**Werner C. von CLEMM et al., Plaintiffs-Appellants,**

v.

**Elizabeth Rudel SMITH, Treasurer of the United States, et al., Defendants-Appellees,**

and

**International Mortgage & Investment Corporation, et al., Intervenor Defendants-Appellees.**

**No. 427, Docket 30288.**

United States Court of Appeals Second Circuit.

Argued June 3, 1966.

Decided June 22, 1966.

John A. Wilson, New York City (Robert L. Clare, Jr., B. G. Andrews, Thomas A. Dieterich, and Shearman & Sterling, New York City, on the brief), for appellants.

Bruno A. Ristau, Atty., Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., and Morton Hollander, Dept. of Justice, Washington, D. C., Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, on the brief), for appellees.

Amos J. Peaslee, Jr. and Waldemar J. Dittmar, New York City (George Eric Rosden, and Butler, Koehler & Tausig, Washington, D. C., of counsel), for intervenors.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Werner C. von Clemm individually and as a partner of Rayford D. Alley, Trustee for von Clemm's children, in Bridge Import Company, appeals from a judgment dismissing the suit brought pursuant to § 9(a) of the Trading with the Enemy Act, 50 U.S.C. App. § 9(a), by himself and Alley against the Treasurer of the United States and against the Attorney General, to recover property vested by the Alien Property Custodian under § 5 of the Act. The District Court for the Southern District of New York, Edward C. McLean, Judge, held that von Clemm was an enemy under the Act, and therefore not entitled to recover. 255 F.Supp. 353. The court did not reach the question of title. We find no error and affirm the judgment.

Von Clemm sought recovery of shares of stock in Pioneer Import Corporation of New York and of diamonds and synthetic and semi-precious stones or

their proceeds. The jewels were seized prior to the outbreak of war with Germany (December 11, 1941) by Customs and by Postal authorities, and vested by the Alien Property Custodian in 1945.

Judge McLean's opinion contains a full statement of the facts. It is enough here merely to state the following. Von Clemm was a citizen of this country born in Germany. Around 1938 he conceived of a plan to import German goods into this country by paying for them one-half in dollars and one-half in German Marks which could be obtained at a substantial discount due to the fact that they were blocked. His plan was to have the owners of these blocked Marks purchase the German products in Germany, and send them to the United States through Pioneer, which he had organized, and through associates in Europe. Apparently this scheme was purely commercial. In any case none of the goods at issue here were paid for in any part with blocked Marks.

On May 10, 1940, the Low Countries were overrun by the German armed forces. On that date the Presidential freezing order of April 10, 1940, covering Denmark and Norway, Executive Order 8389, 12 U.S.C. § 95a note, was extended to these newly occupied countries. Under the order, transactions in property with those countries, and, more directly, transactions in payment for such property, were severely regulated, so that exports from those occupied countries to the United States could neither enter this country, nor could payment therefor leave this country, without license. This order was extended to most other European countries, including Germany and Switzerland, on June 14, 1941. See 12 U.S.C. § 95a note. Until that date there was no impediment on importing German goods into this country from Germany or Switzerland, although importers had to avoid the British blockade.

Eleven days after the low countries were occupied, on April 21, 1940, von Clemm sent a memorandum to his brother, a German national, under an assumed name, in Bologna, Italy. The memorandum stated:

> The recent Rotterdam developments should make it interesting for us to enter the diamonds picture * * *. Please discuss with Cremer.

Cremer was an official of the German Economics Ministry (RWM), an expert on diamonds, with whom von Clemm had conferred in Europe in 1939. He was in Belgium as advisor to the German military government there as to the sale in the United States of Belgian diamonds for dollars. There is no direct evidence that von Clemm knew of Cremer's status in Belgium.

On October 25, 1940, Cremer submitted a memorandum to one Major Lemberg, the official of the German military government in charge of Belgian diamonds, which said:

> The isolation of Belgium from the entire other foreign world makes resumption of the diamond export possible only with the assistance of Germany as mediator [middle-man?] * * *. In accordance with personal conferences, the Imico-Handel, Berlin * * * takes over the function of the necessary intermediate agency in Germany.

Imico was a German firm set up by Carl von Clemm, appellant's brother, and two associates, all of whom had previously worked for Eurohandel, a firm which had assisted in the blocked Marks transactions. The Cremer memorandum explains the role of Imico in diamond shipments: Belgian diamonds go by courier to Berlin, where Imico arranges the necessary papers, ships the diamonds to a neutral agent (a "cloak") in Portugal, who sends them along to New York; the New York buyer makes payment to a Berlin bank for account of Imico, which turns the money over to the German government. There was no direct evidence that von Clemm knew of this memorandum. Lemberg testified that Imico was the commercial agent of the Reich, but not that von Clemm knew this.

Between October 26, 1940 and early February, 1941, six packages of diamonds were sent by this route, according to plan. Evidence was introduced that a New York diamond purchaser received a letter from a former Belgian supplier offering diamonds, and accompanying the letter was a note instructing the buyer to make payment for credit of Imico at the Berlin bank, and to address communications to [an alias of] one of the Imico organizers in Lisbon. The Belgian supplier testified that he was directed to write the letter by Lemberg.

■ So far von Clemm's knowledge of the role of the German government as the real exporter and the party receiving payment is largely a matter of suspicion. But there is evidence that on June 27, 1940, Imico wrote Pioneer concerning diamond purchases, and said, "The Reich Economic Ministry want to do business with us and you * * *, your commission to be 2 percent," shipment via Lisbon. Based upon this and other evidence the District Court found that prior to the outbreak of war with Germany, von Clemm was a [knowing] agent of the German government in the export of Belgian diamonds. This conclusion is unassailable, and we regard appellant's attack on this finding as frivolous.

One of the diamond shipments cleared customs in this country, and the diamonds were sold. This resulted in a conviction of von Clemm on conspiracy to import under a false declaration that the diamonds were of German origin, and to violate § 95a and the freezing order as applied to Belgium. United States v. Von Clemm, 136 F.2d 968 (2 Cir.), cert. denied 320 U.S., 769, 64 S.Ct. 81, 88 L. Ed. 459 (1943). The other shipments were seized by Customs and later vested by the Alien Property Custodian, and sold.

Von Clemm also engaged in the importation of German cut semi-precious and synthetic stones prior to the outbreak of war. Most such stones apparently are manufactured and/or cut in Germany, with the United States historically the principal market. This industry was highly regulated in Germany, but not, in a technical sense, nationalized. The German government regulated the export of the stones, in particular. Commencing in 1939, the government informed the stone cutters that export of the stones would have to be through Eurohandel. At the same time Eurohandel cabled Pioneer "RWM appoint you sole importer synthetics." When Imico was formed it was designated by the RWM as the replacement for Eurohandel as the exclusive exporter of the stones. Apparently Imico performed much the same services as with the diamonds. It paid the cutters, and received payment from von Clemm. Dollars were sent to neutral countries by von Clemm (first to the low countries, later Switzerland), and were drawn on by Carl von Clemm and others in Imico. The stones themselves were shipped by way of a Swiss "cloak" named Lambercier, who was made to appear the purchaser of the stones for his own account, and the exporter to the United States as owner of the stones. 270 packages of stones were seized by Postal authorities in this country, turned over to Customs, and vested by the Alien Property Custodian.

■ The evidence in these transactions tending to show von Clemm was an agent of the German government as to them was, besides the similarity to the diamond transactions, the fact that some of von Clemm's payments went to the account of the German Navy in Switzerland, under a code name "Jalmac," which name appears in von Clemm's books of account. Von Clemm denied knowledge that the Navy was the recipient of the funds, but the District Court did not believe him, and found he was an agent of the German government as to these transactions. Such a finding may be disturbed if it is clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure. However, the similarity to the diamond transaction and the existence of the name "Jalmac" are enough to make this finding not clearly erroneous. Dickinson v. Burnham, 197 F.2d 973, 977–978 (2 Cir.), cert. denied 344 U.S. 875, 73 S.Ct.

169, 97 L.Ed 678 (1952); United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2 Cir. 1945). It is implicit in the finding that von Clemm knew the German government was ending up with the funds and that Imico was its arm, and while this is largely an inference from undisputed facts (except as to von Clemm's denial, which, having been disbelieved, is worthless), a matter which has been held more freely reviewable, Orvis v. Higgins, 180 F.2d 537 (2 Cir.), cert. denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950); Iravani Mottaghi v. Barkey Importing Co., 244 F.2d 238, 248 (2 Cir.), cert. denied 354 U.S. 939, 77 S. Ct. 1402, 1 L.Ed.2d 1538 (1957), it is now settled that such inferences are themselves to be respected unless clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We can hardly reverse to substitute for one inference another which is no more probable.

But, as all the parties recognize, it is von Clemm's status after December 11, 1941, when hostilities commenced with Germany, that determines whether he is an enemy, and so barred here. Von Clemm had the burden of persuasion on the issue of his enemy status, as on every issue, Societe Internationale Pour Participations, etc. v. Rogers, 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). He attempted to meet this burden by a denial that he continued to operate as he had before. The District Court did not believe him. In addition, evidence was adduced as to conduct after the outbreak of the war, part of which tends to show he ceased his importing operations, and part the opposite, although none of the evidence is conclusive.

First, on December 18, 1941, one week after the outbreak of war, von Clemm cabled Lambercier asking that he "Send proof diamond one same as others" and noting that "License 213177 no funds while merchandise held pending investigation." The District Court interpreted the first phrase to mean that von Clemm, facing indictment on the first diamond shipment, desired proof of the German origin of the diamonds (which were in fact Belgian). While this is not altogether clearly the meaning, especially in view of the fact that Lambercier apparently played no role in the diamond transactions, as interpreted by the District Court it is of some slight relevance on the question whether von Clemm continued his activities after December 11.

The second event was that von Clemm received in March, 1942, a letter dated January 28, 1942, from Le Coultre & Cie of Geneva saying that it had consigned two boxes of stones to Bridge. This dealt with a shipment negotiated before the outbreak of war. Von Clemm, on receiving the stones, turned them over to another dealer.

Finally, on April 21, 1942, von Clemm applied for a license to pay funds *into* a blocked account of Lambercier, but was unsuccessful. The money was in payment of a prewar shipment then held by Customs.

Additionally, there was evidence that von Clemm's attorney advised him to cease dealing with Lambercier after Lambercier in January, 1942 was placed on the Proclaimed List of Blocked Nationals, and to dissolve the Bridge partnership, of which Lambercier was by then a partner. To this von Clemm replied that he would wind up Bridge, and notify the Treasury. There was no evidence that he did either.

Von Clemm argues that these events are insufficient to show that he was an agent of the German government after the outbreak of war. But since he had the burden of proving he was not an enemy agent, the only relevance of these events is insofar as they meet his burden. Von Clemm argues that the presumption that an agency continues is inapplicable in the case where war intervenes, Insurance Co. v. Davis, 95 U.S. 425, 24 L.Ed. 453 (1887), and the government counters with Williams v. Paine, 169 U.S. 55, 18 S.Ct. 279, 42 L.Ed. 658 (1898), and

Sutherland v. Mayer, 271 U.S. 272, 288, 46 S.Ct. 538, 70 L.Ed. 943 (1926). But these cases deal with whether an agent's authority is terminated by war, a question we regard as irrelevant. Certainly if von Clemm ever had any authority to bind the German government, the intervention of war did not alter the intent of the parties to that agency. And the word "agent" in § 2 does not really mean an agent in the sense of one with authority to bind, rather, it means merely one who carries out instructions, an operative, as in the colloquial "secret agent." Since one could be found to be an enemy agent having no authority to bind the enemy government, cases dealing with the termination of commercial agency are inapposite.

■ All von Clemm has to meet his burden is his denial, which was not believed, his correspondence with his attorney concerning the dissolution of the Bridge partnership, and the rather equivocal "refusal" of the Le Coultre shipment. It was not error for the District Court to conclude that he had not met his burden of proving non-enemy status.

Affirmed.